IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JERMEKA HOBBS, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CASE NO.: |
| | ) | |
| UNIFIED GOVERNMENT OF | ) | |
| WYANDOTTE COUNTY AND KANSAS | ) | |
| CITY, KANSAS; | ) | |
| | ) | |
| *POLICE CHIEF DEFENDANTS:* | ) | |
| THOMAS DAILEY; JAMES SWAFFORD; | ) | |
| RONALD MILLER; SAMUEL | ) | |
| BRESHEARS; RICK ARMSTRONG; | ) | |
| ELLEN HANSON; ALL IN THEIR | ) | |
| INDIVIDUAL CAPACITIES | ) | |
| | ) | |
| *DETECTIVE DEFENDANTS:* | ) | |
| ROGER GOLUBSKI; MICHAEL KILL; | ) | |
| CLAYTON BYE; TERRY ZEIGLER; | ) | |
| DENNIS WARE, ALL IN THEIR | ) | |
| INDIVIDUAL CAPACITIES, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Jermeka Hobbs, by and through her attorney Madison McBratney of Webster Law, LLC, and alleges:

<u>TABLE OF CONTENTS</u>

Table of Contents ......................................................................................................... i

Introduction ............................................................................................................... 2

Jurisdiction and Venue .............................................................................................. 7

Parties ........................................................................................................................ 7

    Plaintiff .................................................................................................................. 7

    Unified Government ............................................................................................. 7

    Police Chief Defendants ...................................................................................... 8

    Detective Defendants ........................................................................................ 10

Facts ......................................................................................................................... 12

    For decades, Defendants operated a government-sanctioned protection racket ................ 12

    With the Unified Government's full knowledge, this criminal enterprise spent decades terrorizing the Black community, preying upon and coercing sexual acts from vulnerable Black women ................................................................................................................ 14

    Golubski groomed and threatened Jermeka Hobbs in order to traffic her as one of "Golubski's Girls" ..................................................................................................... 18

    The Unified Government Caused Plaintiff's Injuries ........................................ 23

        Informal policies, procedures, and customs created widespread practice of police abusing government authority ........................................................................... 25

            Kidnapping, Coercing, Pressuring, Sexually Assaulting, and Raping Black Women ................................................................................................... 25

            Improper Investigative Practices to Obtain Wrongful Convictions and Support the Government-Sanctioned Protection Racket .......................... 27

            Discouraging, Preventing, and Failing to Investigate Complaints of Misconduct ................................................................................................... 33

        Failure to adequately train and supervise its employees permitted the conduct ..... 37

        Police officers readily admit the existence of the Unified Government's *de facto* policies and procedures .......................................................................................... 39

        Decisions by Chiefs of Police encouraged further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse ..................................... 43

Damages ................................................................................................................... 44

Defendants Conduct has Tolled any Statutes of Limitation ...................................... 45

Claims for Relief ...................................................................................................51

     COUNT 1  Forced Labor in Violation of 18 U.S.C. § 1589(a) ............................53

     COUNT 2 Trafficking with Respect to Involuntary Servitude or Forced Labor in Violation of 18 U.S.C. § 1590(a) ..........................................................................55

     COUNT 3 Sex Trafficking by Force, Fraud, or Coercion in Violation of 18 U.S.C. § 1591(a) ......................................................................................................55

     COUNT 4 Obstruction, Attempted Obstruction, Interference with Enforcement in Violation of  18 U.S.C. § 1590(b) and 18 U.S.C. § 1591(d)...................................57

     COUNT 5 Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983.................................................................................................59

     COUNT 6 Failure to Intervene in Violation of 42 U.S.C. § 1983 ........................61

     COUNT 7 Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983 ..................62

     COUNT 8 Supervisory Liability in Violation of 42 U.S.C. § 1983.......................63

     COUNT 9 *Monell Claim for Unconstitutional Customs, Polices, and Practices  in Violation of 42 U.S.C. § 1983*................................................................................65

     COUNT 10 *Violation of the Equal Protection Clause of the Fourteenth Amendment   in Violation of 42 U.S.C. § 1983*......................................................67

     COUNT 11 *Violation of Title VI  in Violation of 42 U.S.C. § 1983*...................68

     COUNT 12...................................................................................................69

     *Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")*.69

Demand for Jury Trial ............................................................................................72

Designation of Place of Trial....................................................................................72

Prayer for Relief .....................................................................................................72

## INTRODUCTION

1.     Jim Crow's "separate but equal,"  affirmed by the Supreme Court of the United States gave way to continued white supremacy and oppression of newly freed African Americans. It stripped Blacks of their freshly minted civil rights, and made it easier to arrest and convict them. Jim Crow effectively regarded Black bodies the same as domesticated animals, not entitling them to dignity or police protection. But Jim Crow was not restricted to the south—it poisoned the Free State, despite its Capitol's mural of John Brown raging against the injustice of white supremacy.

2.      This case evidences the Free State's deep infection, an infection that has inflicted unconstitutional horrors on the most vulnerable and employed threats and terror to deny them any remedy. For decades, the Unified Government gave its law enforcement officers, personified by Golubski but also including his coconspirators, permission to terrorize, abuse and violate citizens living in predominantly Black neighborhoods in Kansas City, Kansas (sometimes referred to as "KCK"). With government authority, a plague of State agents have used their badges as licenses to stalk, assault, beat, rape, harass, frame and threaten Black residents in the officers' protected hunting grounds.  Evading outside scrutiny decade after decade, the officers have continued to sow the abuses of Jim Crow to the present day. Over decades, they have threatened, coerced, assaulted, raped and manipulated society's most vulnerable for their own sadistic pleasures or pursuits. Along with their co-conspirators, these officers wantonly violated their oaths and the law, leaving their resulting crimes "unsolved" or framing innocent residents. These officers have seemingly operated in a realm above the law. Their conduct is not only reprehensible, vile, and malicious, it left powerless victims with no remedies, as complaints of any kind have typically led to threats, harassment or worse.

3.      This case is not just about Roger Golubski and his widely known sexual predations and assaults of Black women. The momentous issue concerns the responsibility public officials should bear for the longstanding, systemic abuses and crimes inflicted by police on the population they swore to serve. Instead of honoring their oaths, these officers used their badge as leverage to allow them to freely extort, assault, rape, and steal from the people they were supposed to protect. For decades, these officers have terrorized the Black community in Kansas City, Kansas, and the community's fear of their lawlessness continues to this day. The Chiefs of Police, their command staff, and other responsible public officials, though informed and aware of these abuses and criminal acts, permitted the abuse of Black residents that has lasted for decades, destroying lives and families.

4.      The victim in this case provides a representative picture of the wrongs inflicted upon hundreds of victims, living and dead. Moreover, more women filed an analogous case in which their claims are similar. Michelle Houcks[1] and Ophelia Williams are victims of particularly vicious rapes accompanied by threats of death or other retaliation if they attempted to complain. Saundra Newsom was stalked and propositioned under the guise of investigating her son's murder, which was committed by drug traffickers who were protected by the KCKPD. To protect the perpetrators who murdered Saundra's son and a second victim, eyewitness Niko Quinn was forced to coerced to identify an innocent man and perjure herself under threat of wrongful imprisonment and having her children stolen. Richelle Miller was sadistically tortured, senselessly forced to view her father's unidentifiably charred corpse, and then falsely arrested while repeatedly and groundlessly accused of incest and complicity in her father's murder. The brutal 19-hour long tag-team interrogation culminated in sexual assault. Jermeka Hobbs, the Plaintiff in this case, a victim of domestic violence, was targeted, sexually extorted and groomed to serve as one of "Golubski's Girls." Without explanation, Golubski drove her through isolated areas and back roads, showing her Polaroids of murdered women.  Reprehensible. Inexcusable. Malicious.

5.      The Unified Government permitted this unlawful terrorization by the KCKPD. With the full knowledge of supervisors, including the Chiefs of Police, official government authority was used to gain leverage over and coerce submission from vulnerable Black women. These victims were forced to obey Defendants' demands, including submitting to sexual assault and fabricating evidence to allow police to cover for their criminal co-conspirators. Using (actual or threats of) physical violence, arrest, or sexual assaults to them or their loved ones if they talked, Defendants covered

---

[1] Michelle Houcks, Saundra Newsom, Niko Quinn, Ophelia Williams, and Richelle Miller filed similar claims in *Houcks, et al. v. Unified Government of Wyandotte County and Kansas City Kansas et al.,* Case No. 2:23-cv-02489, currently pending in the United Stated District Court for the District of Kansas.

their tracks to ensure that their unlawful conduct could continue, unchecked, and with little or no protest from any member of the public. To solidify their authority, Defendants ensured they publicly harassed and abused women and publicized their successful pinning of false charges on innocent people.  Defendant Golubski was known to tell women that if they complained, they would end up dead and dumped in a place where "no one would find" them, or that a precious loved one would be harmed or targeted with a false case.

6.      The officers' unchecked power and use of terroristic threats forced victims to maintain their silence, to hide from Defendants and tell no one their stories. Victims remained fearful that if they spoke out, that Golubski would make good on his threats -- they would "go missing" or their bodies would be dumped in the river, just as Golubski had warned one of his child-victims adding his own chilling twist to a nursery rhyme:

> *Down by the river, said a hank-a-pank;*
> *Where they won't find her until she stank.*

7.      Defendants' brazen misconduct gave license to others to also engage in illicit acts, sexually exploiting black women, shaking down drug dealers and ruling a vulnerable community with threats, lawless force and terroristic acts.  When those who were not a part of this criminal syndicate complained about their colleagues' misconduct, they quickly found that they were shunned, ostracized or subjected to bogus internal affairs investigations. Some were harassed and labeled "rats"; others were falsely "*Giglioed,*" which meant that they had "credibility issues" and were not considered fit for courtroom testimony. Those who strived to serve honorably could find themselves alone, without backup, on dangerous calls.  Reporting the misconduct of fellow officers was a risky business and typically one that led to little other than retaliation against the honest officer.

8.      As intended, Defendants' brazen and notorious corruption was exercised for decades with such impunity that many in the Black community believed that Defendants were and are

"untouchable," beyond the reach of any internal complaint or legal action. Defendant Golubski, in particular, was viewed as a mobster – so powerful that he was beyond the reach of the law and any complaint against him was almost certain to result in dire or deadly consequences for the person who dared to speak up. Golubski and other "dirty cops" showed their victims that they had no fear of repercussions for their conduct. For example, after raping Ophelia Williams in her home, Golubski methodically wiped bodily fluids off his penis with paper towels in Williams' kitchen. When she mentioned making a complaint about him, he brushed her off: "*Report me to who, the police? I am the police.*" (Emphasis added) Similarly, while brutally raping Houcks after he lured her into his police car with the promise of a ride, Golubski calmly told her he was assaulting her "because I can." Golubski's calmness and utter lack of fear – even while raping a woman – is spine-chilling and evidences the degree to Golubski felt completely insulated from any consequences and was protected by a Department which enabled and even endorsed his brutal and illicit conduct.

9.     Although Golubski was viewed as the most flagrant and notorious lawbreaker – particularly with respect to raping women and inflicting terror on the community – he was far from the only one. Golubski and other officers took Black residents to remote areas, often at night, where their prey were trapped – alone, defenseless and with nowhere to run. At night, near the riverbank, next to the railroad tracks or along many of the back roads leading to dead ends or empty fields, Golubski and others brutalized men and sexually assaulted women. Golubski and other officers shook down drug dealers, at times stealing even their jewelry and clothes and sending them home in their underwear. They threatened men with jail and arrested them on false charges, then pressured purported witnesses to give statements or be arrested themselves. The residents of the north end knew that Defendants and other officers could swiftly make good on their threats. Even as the *The Kansas City Star* published in 2021 and 2022 a series of investigative news stories that revealed

KCKPD's corruption, receiving national attention and earning the Star's columnist a Pulitzer Prize, Golubski's victims watched as Golubski continued to walk free and collect his KCKPD pension. It was obvious to all: Golubski and the other corrupt officers were immune from all responsibility for their crimes and wrongdoing. They were untouchable. As if to further flaunt their power, Defendants continued falsely representing to the world that the Unified Government's policing was guided by its motto:



The Black community in KCK have long known how fraudulent this representation is. Is protecting violent drug gangs "safety first"? Is raping Black women "courtesy always"?

10.     Finally, on the early morning of September 15, 2022, Plaintiff was given her first reason to believe that Golubski might finally face consequences for his decades of terrorizing and abusing the Black residents of Kansas City, Kansas. After years of raping and assaulting women, Golubski was finally arrested for his heinous acts in violating the civil liberties of those he was sworn to protect. In detail, the indictment laid out allegations that Golubski had kidnaped, raped and sexually assaulted female victims, one of whom was a minor. That night, and for the first time in decades, Plaintiff believed that Golubski might face legal consequences and that now – finally – she might seek justice that was long overdue.

11.     On November 11, 2022, another indictment was filed, charging Golubski for engaging in a wide-ranging conspiracy with a drug kingpin and his cohorts to operate a sex-trafficking conspiracy that included underaged girls who were held against their will.  Golubski's involvement with the sex trafficking was part and parcel with his involvement with drug gang that had long had him on the payroll.

12.     Despite these high profile arrests, Plaintiff and other victims in the community remain vulnerable to the danger posed by Golubski's longtime colleagues who remain in the KCKPD.   After years, even decades of silence, Plaintiff and other victims are telling their stories for the very first time.   They are seeking justice despite receiving threatening messages, despite homes being broken into, despite brake lines being cut, and despite other intimidation tactics.   Nevertheless, because of Golubski's arrest, his multiple federal criminal charges, and the publicity surrounding each, Plaintiff finally feels safe *enough* to stand up and expose the corruption, abuse, and racism – the Jim Crow – that has diseased her community for decades.

## JURISDICTION AND VENUE

13.     This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law for the rights of Jermeka Hobbs as secured by the United States Constitution.

14.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1343 and 1367.

15.     In addition, this Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

16.     Venue is proper under 28 U.S.C. § 1391(b)(1) because, upon information and belief, all Defendants are residents of Kansas; and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

### Plaintiff

17.     Plaintiff Jermeka Hobbs is an individual citizen of the State of Missouri.

### Unified Government

18.     Defendant Unified Government of Wyandotte County and Kansas City, Kansas ("Unified Government"), is the successor of the municipality, the City of Kansas City, Kansas. The Unified Government was created by and established under the law of the State of Kansas in 1997. It

7

is authorized to sue or be sued in its own name. Its headquarters is located at 701 N. 7ᵗʰ Street, Kansas City, Kansas. The City of Kansas City, Kansas is a subdivision of the Unified Government and is located within Wyandotte County, Kansas ("KCK"). The Kansas City, Kansas Police Department ("KCKPD") is an agency of the Unified Government. Moreover, KCKPD receives funding from the federal government.

<u>Police Chief Defendants</u>

19.     Defendant Thomas Dailey was, from May 1989 until at least 1993, the duly appointed and active Chief of Police of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Prior to serving as Chief of Police, Dailey was the Captain of KCKPD's vice unit, and was accused of accepting protection money for illicit prostitution operations in KCK in exchange for advance notice of police raids. *United States v. Russo*, 527 F.2d 1051, 1053-54 (10th Cir. 1975). Upon information and belief, Dailey is entitled to indemnification under statute and by contract. He is sued in his individual capacity and his official capacity.

20.     Defendant James Swafford was, from 1995 until 2000, the duly appointed and active Chief of Police of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, Swafford is entitled to indemnification under statute and by contract. He is sued in his individual capacity and his official capacity.

21.     Defendant Ronald Miller was, at times relevant to this Complaint, a duly appointed and active police officer of KCKPD, ultimately the Chief of Police, acting within the scope of his

employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Miller served as Chief of Police for KCKPD from 2000 to 2006. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and his official capacity.

22.     Defendant Samuel Breshears was, at times relevant to this Complaint, a duly appointed and active police officer of KCKPD, ultimately the Chief of Police, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Miller served as Chief of Police for KCKPD from 2006 to 2010. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and his official capacity.

23.     Defendant Rick Armstrong was, at times relevant to this Complaint, a duly appointed and active police officer of KCKPD, ultimately the Chief of Police, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Miller served as Chief of Police for KCKPD from 2010 to 2013. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity and his official capacity.

24.     Defendant Ellen Hanson was, in 2014, the duly appointed and active Chief of Police of KCKPD, acting within the scope of her employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, Hanson is entitled to indemnification under statute and by contract. She is sued in his individual capacity and his official capacity.

25.     Within this Complaint, and during the time frame that each served as KCKPD's Chief of Police, Dailey, Swafford, Miller, Breshears, Armstrong, and Hanson are collectively referred to as the "Police Chief Defendants."

<u>Detective Defendants</u>

26.     Defendant Roger Golubski was, at times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

27.     Defendant Terry Ziegler was, at times relevant to this Complaint, a duly appointed and active police officer and detective of KCKPD, ultimately becoming the Chief of Police, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Ziegler served as Chief of Police for KCKPD from 2015 to 2019. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

10

28.     Defendant Mike Kill was, at times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

29.     Defendant Clayton Bye was, at all times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

30.     Defendant Dennis Ware was, at times relevant to this Complaint, a duly appointed and active detective of KCKPD, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of the City of Kansas City, Kansas, and its successor the Unified Government of Wyandotte County and Kansas City, Kansas as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

31.     Within this Complaint, Detectives Golubski, Kill, Bye, Ware, and Ziegler (during the time frame he was employed by KCKPD, but was not its Chief of Police) are collectively referred to as the "Detective Defendants."

## FACTS

### For decades, Defendants operated a government-sanctioned protection racket

32.     "It is difficult to keep a continuing criminal enterprise profitable and survive over the long term unless there is a means to protect it from law enforcement, which ultimately learns of its existence."[2] For decades, the most powerful gangs in KCK were sanctioned by, and operated under the protection of, the Unified Government itself.

33.     With Golubski at its head, Defendants formed and operated an organized police protection racket, which operated an open and notorious protection racket ("Protection Racket"). Defendants' Protection Racket protected violent gangs and criminals who sold illegal drugs and trafficked women, including minors. The Protection Racket offered drug dealers and sex traffickers (i) protection from law enforcement, (ii) advance notice of police raids, and (iii) coverups for gang murders. In exchange, the Protection Racket received money, drugs, stolen goods and access to exploited and vulnerable women and girls.

34.     To build its power and corner the corruption market, Defendants' Protection Racket included government agents using the power of their official positions to permit, encourage, foster, and cultivate illegal activities, including the sale of crack cocaine and other drugs, gambling, trafficking in stolen goods, sex trafficking and prostitution. "Corruption supports the ongoing existence of organized crime, because corrupt public officials protect organized criminal groups from law enforcement and disruption."[3]

---

[2] *United Nations Office on Drugs and Crime*, E4F University Module Series: Organized Crime, Module 4: Infiltration of Organized Crime in Business and Government, *available at* https://www.unodc.org/e4j/en/organized-crime/module-4/key-issues/links-to-corruption.html.

[3] *United Nations Office on Drugs and Crime*, E4F University Module Series: Organized Crime, Module 4: Infiltration of Organized Crime in Business and Government, *available at* https://www.unodc.org/e4j/en/organized-crime/module-4/key-issues/links-to-corruption.html.

35.    Golubski used his powers and privileges as a police detective to manage the Protection Racket's operation. As a result of the Unified Government's culture, Golubski was able to begin his unlawful conduct almost as soon as he graduated from the KCKPD police academy in 1975. Golubski covered up gang killings; received money, drugs, and women from gangs under his protection; provided advance notice of police raids; shook down lower-level street dealers to extract compensation; openly and notoriously raped and sexually assaulted non-gang citizens; and assisted in trafficking women, including minors.

36.    Zeigler was Golubski's partner and served as Chief of Police for KCKPD from 2015 to 2019. While a detective, Ziegler helped obtain false convictions and encouraged the Protection Racket's conduct, as detailed herein. While Chief of Police, Ziegler protected and enabled the Protection Racket, fostered a culture of unlawful and unethical police conduct, failed to discipline or otherwise prevent the unlawful conduct detailed herein, and otherwise ensured the conduct he knew was occurring was not stopped and instead was protected from oversight or discipline.

37.    Kill, Bye, and Ware were KCKPD detectives and aided the Protection Racket by fabricating false evidence and testimony, enforcing ultimatums and threats on innocent civilians, and shaking down drug dealers to extort and collect "protection" payments, including stolen goods.

38.    Defendants' Protection Racket was well known in KCK generally and to the Unified Government specifically. The Protection Racket paid employees and leadership within the Unified Government to ensure its operations and members remained untouched and undisciplined. The Unified Government's policies, procedures, practices, and culture enabled, fostered, and permitted Defendants' Protection Racket's operation and growth. Its very formation and ability to continue was a direct result of the Unified Government's own conduct.

13

39.     For example, police raids on known drug houses often came up empty, either because the drug dealers had been tipped off or because the police had stolen all of the drugs and then reported, falsely, that they found nothing.  When police seized drugs in such operations, it was not for a law enforcement purpose – the drugs went right back on the street, with the profits flowing right back to the corrupt officers.  In the event a legitimate raid was planned, major gangsters, such as Cecil Brooks, were always one step ahead, and, the raiding officers left empty-handed. As long as the big drug dealers kept police on their payroll, they were rarely, if ever, arrested.  Over decades, the ability of the major gangs to operate with impunity made it obvious to all that they were operating with official protection.  KCKPD commanders and others in the Unified Government either turned a blind eye, or, as was often the case, benefitted from the illicit arrangements themselves.

40.     Defendants' Protection Racket also operated a network of women that the Unified Government and its employees crudely or jokingly (depending on one's viewpoint) referred to as "Golubski's Girls." Golubski insisted upon a proprietary interest in these women, which was respected by the Unified Government. Their identities, how he secured them as "informants," how he managed them, how (or whether) they provided any information was never documented. Everything about "Golubski's Girls" was accepted as one of Golubski's secrets. Plaintiff was one of those secrets.

41.     The Unified Government and KCKPD commanders were well aware of Golubski's illicit practices, which were the subject of crude jokes and also conveyed implicit approval for others to sexually assault or exploit vulnerable women in the community. The few commanders who claimed to lack knowledge of Golubski's activities were willfully blind, ignoring numerous red flags and allowing the Protection Racket to shield "Golubski's Girls" and a host of other illegal activities.

**With the Unified Government's full knowledge, this criminal enterprise spent decades terrorizing the Black community, preying upon and coercing sexual acts from vulnerable Black women**

42.     For decades, Detective Defendants and Police Chief Defendants were dirty cops who used the power of their badge to exploit Black women, including women working as prostitutes. Beginning as early as the 1980s and continuing for more than two decades, they haunted Quindaro Boulevard and the housing projects in the north end of KCK, hunting Black women and taking what they wanted. Today, the unlawful conduct remains and Defendants continue to protect and guard the "secrets" of the department by intimidation, threats, and other actions effectively keeping those with knowledge at bay rather than coming forward with information that would indict such actions.

43.     Defendants' Protection Racket acted as "Protector" for multiple criminal organizations. The criminals empowered by Defendants' Protection Racket "engaged in kidnappings, beatings and other violent acts." Killings, such as the killing of Saundra Newsome's son Doniel Quinn, were ordered and executed by organized criminals as part of their agreement with Defendants' Protection Racket. Because criminals knew that they were protected by Defendants' Protection Racket, they "knew they could [kill people] because they had Golubski on their team." With a prominently placed cop as a member of the criminal enterprise, they were able to kill with impunity: "the perception was that they could do anything."[1]

44.     Detective Defendants arrested, or threatened to arrest, women, sometimes without cause, and used the threat of prosecution to obtain sex acts. Golubski often told his victims that he had connections inside the Unified Government's Prosecutor's Office. Though he would sometimes pay his victims with drugs or money, Golubski's preferred currency was threat and force.

45.     The predilections and abuses of Detective Defendants were well-known among KCKPD officers and supervisors, including Police Chief Defendants. The squad room openly joked

---

[1] The Kansas City Star, *Ex-KCK cop Golubski had ties to criminals, prosecutors say. Was he their 'protector'?*, The Kansas City Star (November 2, 2022, 5:00 AM), https://www.kansascity.com/news/local/crime/article267104436.html#storylink=cpy

about mistreatment of Black women and the many "halfbreed" offspring Golubski had likely fathered by his victims. It was widely known among KCKPD officers and supervisors that when Golubski and Ziegler were patrol partners, Golubski would arrest Black prostitutes, force them into sex acts – even at the precinct house itself – and release them without ever pressing charges. Meanwhile, it was widely known among KCKPD officers and supervisors that when Detective Defendants went out on calls, they would shake down Black drug dealers, stealing money and drugs and release them without ever pressing charges.

46.     Golubski often fixated on particular women, harassing them for months, or even years. Once he gained leverage over a woman, he would demand that she carry out other acts for him, with his extortionate control sometimes lasting years. Always under the threat of violence or false convictions through conspirators in the Unified Government, Detective Defendants ensured their unlawful and illegal conduct remained concealed.

47.     After Golubski established his dominance, he used many of his victims as "informants" to help him "clear" cases. KCKPD officers and supervisors and the Prosecutor's Office came to expect that the women they called "Golubski's Girls" would provide critical evidence leading to convictions in many of Golubski's investigations. The Unified Government knew that the information coming from Golubski's informants was unreliable because it was the product of his coercive relationships. Nevertheless, they continued to rely upon it, and failed to disclose this conflict. The Unified Government obtaining convictions based (sometimes exclusively) on this knowingly unreliable, false, and coerced testimony.

48.     Defendants' Protection Racket worked closely with KCK drug kingpins, including Cecil Brooks, to protect their interests. In exchange for money, sex, or drugs, Detective Defendants fixed investigations, including making cases and witnesses disappear while framing innocent people

16

for crimes committed by drug gangs. The drug kingpins also provided Defendants with successful drug busts to keep up appearances that KCK was aggressively pursuing illegal drugs. In reality, these were pre-arranged raids and netted minimal money, drugs, or guns. Detective Defendants' relationship with the drug underworld was also widely known in, and accepted by, KCKPD and the Police Chief Defendants. But because their network of trafficked women and drug kingpins kept closing cases, the Unified Government approved, endorsed, and enabled the conduct to continue.

49.     Golubski was known to be especially close to Cecil Brooks, and they were often seen by the community and KCKPD speaking together, either in Golubski's car, in secluded areas, or in Brooks' office at Delavan Apartments. Brooks was known throughout KCK and the Unified Government as an open and notorious dealer of crack cocaine in the 1990s and early 2000s. The "protection" Golubski and other Defendants provided to Brooks allowed him and other high-level drug dealers to operate large, lucrative drug enterprises and engage in violent acts to protect their interests without criminal consequences.

50.     Detective Defendants never sought to conceal their misconduct from other KCKPD officers and supervisors, or the Police Chief Defendants. Although their corruption was common knowledge at the Unified Government, they were never reprimanded and were instead promoted, Golubski becoming a captain before his retirement from KCKPD, and Ziegler becoming Chief of Police. KCKPD officers who were disgusted by this misconduct kept quiet to avoid retaliation – Defendants had powerful friends in KCKPD (including Police Chief Defendants), Prosecutor's Office, Unified Government, and, ultimately, United States Attorney's Office for the District of Kansas.

51.     Following his retirement from KCKPD in 2010, Golubski continued conspiring with criminal gangs while working for the City of Edwardsville, Kansas' Police Department. Despite

knowing that Golubski used his badge as a license to hunt Black women, no one in KCKPD or the Unified Government notified the Edwardsville Police Department of Golubski's conduct. Golubski's criminal activities have continued through today.

### Golubski groomed and threatened Jermeka Hobbs in order to traffic her as one of "Golubski's Girls"

52.     Plaintiff Jermeka Hobbs is one of Defendants' victims—one of the victims Defendants created by allowing Golubski and others to abuse their power and operate a criminal enterprise.

53.     For years, Hobbs knew of Golubski and his corruption. The Black community in KCK openly discussed that Golubski was "crooked." Golubski had a reputation of falsely setting people up for crimes they did not commit. Hobbs also knew of Golubski's reputation for taking vulnerable Blacks' money or stealing their possessions that had a street value at pawn shops. People in the community told Hobbs that Golubski was in the mafia.

54.     In 2005, Hobbs was thrown through her shower doors by her then boyfriend. Hobbs was cut badly, and her children were inside the home during the attack. Hobbs' cousin, who lived several doors down, called 911. Paramedics and the police arrived at the home and Hobbs was taken via ambulance to the hospital.

55.     At the time, Hobbs was an alcoholic and also used marijuana, crack cocaine, and phencyclidine, or PCP. Hobbs knew that when she was thrown through her shower doors, her drug paraphernalia kit (containing PCP, marijuana, crack cocaine, scales, and baggies) was sitting out on the bathroom counter. Injured, Hobbs was unable to hide her drug paraphernalia before paramedics arrived and she was rushed to the hospital.

56.     Knowing the police were inside her home, Hobbs immediately went to her bathroom when she returned home from the hospital. But everything remained exactly like she had left it. Even

the pre-rolled marijuana joint laced with PCP remained untouched on top of her drug kit laying on the bathroom counter.

57.     A few days later, in the early morning hours, a loud knock on her door awoke Hobbs.

58.     Hobbs slowly opened the door to find Golubski in her doorway. As he pushed his way into her home, Golubski mentioned "I have your case." Hobbs understood this to mean her domestic abuse case. Notably, Golubski was a homicide detective and did not actually assist with her domestic violence case.

59.     Standing in her living room, Golubski turned and looked pointedly toward the bathroom, where Hobbs' drug paraphernalia was sitting out when she was taken to the hospital. Golubski began telling Hobbs that she did not deserve how she was treated by her boyfriend. Meanwhile, Golubski alternated between looking toward her bathroom and leering at her body, his gun visible on his hip.

60.     "You sure are cold, aren't you?" Golubski said, while leering at her breasts. Hobbs understood Golubski's message; roused early from sleep, Hobbs had not put on a bra before answering her door. Golubski then looked at her bathroom again. Turning back and glancing down at her breasts, Golubski remarked "I wish I could get my lips on those luscious things.."

61.     Golubski then showed Hobbs pictures of Black men and asked if she knew any of them. Hobbs found this odd, because she knew who threw her through her shower doors. One of the men Golubski showed Hobbs was Cecil Brooks.

62.     After reviewing all of the pictures he brought, Golubski again reiterated how "sorry" he was that Hobbs was treated like that, mentioning again that she "didn't deserve to be treated that way." All the while, Golubski made predatory glances toward her and calculated glances toward her bathroom.

19

63.     Golubski then handed his business card to Hobbs and said "I sure wish I could take you out sometime" before glancing again at her bathroom. Golubski then said he required Hobbs' cell phone number, which she provided as instructed. Golubski said he would come back when he had more information, emphasized she could call him *anytime*, and that he would call her soon. Before leaving, Golubski again glanced at her bathroom and said "we'll make sure we get him."

64.     The entire encounter lasted roughly 20 minutes. As the door latched, Hobbs sunk to the floor, her back against the door, trying to process what just happened. One thing was clear: Golubski knew about the drugs and paraphernalia in Hobbs' bathroom. His implicit threats were also obvious to Hobbs: give him what he wanted sexually, or she would go to jail for the drugs.

65.     Soon after the encounter, Golubski called Hobbs' cell phone and said he wanted to take her to Arthur Bryant's Barbeque for lunch. Feeling she did not have an option, Hobbs agreed. Golubski picked Hobbs up at her home, and Hobbs made sure not to wear anything revealing. Golubski drove them to Arthur Bryant's Barbeque at the Legends Outlets. Golubski, who appeared to be a frequent patron, skipped the line and wandered around speaking with various people.

66.     Oddly, Golubski did not order any food and instead watched Hobbs eat. Suddenly, Golubski said they needed to leave because he needed to go back to work. On the drive back, Golubski said he needed to make a quick stop at his house. As they drove, Golubski said he needed to "just put my lips on you."

67.     Arriving at his house in Edwardsville, Golubski forced Hobbs to enter through his garage via a set of stairs leading into the house. They walked through the living room into a hallway and back into the bedroom. The house was extremely neat, as if it was not lived in.

68.     Once in the bedroom, Golubski told Hobbs to strip naked and get onto the bed. Hobbs complied. Golubski did not remove any clothing and again left his gun attached to his hip.

Golubski ordered Hobbs to lay down on the bed on her back in a position that ensured Hobbs could not see the doorway. Golubski then performed oral sex on her until he suddenly stopped and said he would be back.

69.     Hobbs, fearful she had done something wrong, did not pretend Golubski's touching felt good enough, or somehow upset the person in control of her freedom, called after him. Golubski did not respond. Hobbs got off the bed and walked into the hallway, where Hobbs found Golubski. He was standing against the wall, his left hand bent up and behind his back as if he was hiding something from her, with his right hand holding his phone to his ear. He calmly told Hobbs to return to the bedroom because he was on the phone with his partner. Hobbs did not believe that Golubski was actually on the phone, but she was fearful that Golubski intended to hurt her and was holding something to accomplish that task.

70.     When Golubski returned to his bedroom, he told Hobbs to get dressed because he needed to get back to work. On the drive, Golubski said he did not have time to return Hobbs to her house, and asked if he could drop her off at a relative's. Hobbs reluctantly gave Golubski her sister's address.

71.     Over the next several years, Hobbs' sister would call and say that Golubski had either stopped at the house and asked for Hobbs or would park his car either in front of the house or in its driveway—he did the same at Hobbs' home. Hobbs' neighbor also informed Hobbs that Golubski would show up at random times, including in the middle of the night, and knock on her door asking for Hobbs. Golubski would also drive down Hobbs' street; this would continue to happen, even when Hobbs had moved (multiple times) and did not provide Golubski the address to her new home.

72.     Golubski repeated the process many times—calling Hobbs and informing her that he was going to pick her up. Golubski would pick Hobbs up at her home, at family member homes, and at her work (Hobbs did not tell Golubski where she worked or when she could take breaks, but he seemed to show up at her work during her breaks), drive her to his home, and perform oral sex on her. Golubski would even pick Hobbs up with her kids, dropping the kids off at someone else's house before continuing back to the route to his own house to perform oral sex on Hobbs.

73.     Other times, Golubski would drive Hobbs around KCK on a very specific route, past specific, isolated or abandoned places—places such as the cemetery, the river or areas consumed by garbage. While Golubski was slowly driving through these isolated areas he would show Hobbs photographs or funeral programs of dead Black women. Golubski would ask Hobbs whether she knew the women and would mention they were cases he had. If Hobbs recognized a woman, Golubski wanted to know every detail Hobbs could offer about the woman. During these exchanges, and while showing her the photographs or funeral programs, Golubski would place Hobbs' hand in his crotch and insist that she rub his genitals. Hobbs never felt Golubski become erect despite the aggressive touching he demanded she perform.

74.     Over the course of years, Golubski forced Hobbs to fondle his genitals while he drove and showed her photographs and funeral programs of dead Black women many times. Golubski's drives always included areas of KCK where Black women either went missing or their nude or partially nude bodies were found.

75.     Over the course of these drives, Hobbs began to wonder whether Golubski killed these women. She often felt terrified, but was even more terrified of the potential consequences of not complying with his demands. If Hobbs did not know the woman, Golubski would smirk, glancing at her with an expression that looked to Hobbs as if he were indicating, "I got away with it."

76.     Golubski would also ask Hobbs if she knew certain Black men. If she did, Golubski would give Hobbs one of his business cards and instruct her to tell the man that Golubski wanted to speak with him. But Golubski always instructed, "tell him no house phone. Use a payphone."

77.     Sometimes before dropping her off, Golubski would toss money at Hobbs; telling her she could use the money buy drugs.

78.     Mulitple times, Golubski called Hobbs and instructed her to meet him at the KCKPD police headquarters. Hobbs would walk in and alert the front desk person, who would call back to Golubski. Each time, Golubski would enter the front area with three other detectives, all wearing business clothing. The five of them would then exit KCKPD police headquarters together and walk to separate cars.

79.     Throughout the years in which Golubski was "messing with" Hobbs, Hobbs' children informed her that a man would enter Hobbs' home while she was sleeping and watch her. He was dressed in black boots, a black trench coat, and black gloves—a staple outfit of Golubski.

80.     In roughly 2010, during one of their drives, Hobbs mentioned to Golubski that she had cousins in KCKPD. After Golubski asked who, Hobbs revealed their identities. Golubski commented that it was "interesting," and returned Hobbs to her home. Golubski never called Hobbs again. Out of fear and based on her belief that Golubski was involved in the death of the Black women he quizzed her about, Hobbs never mentioned Golubski's conduct to her cousins in KCKPD.

81.     After Hobbs mentioned this to Golubski, and he began leaving her alone, Hobbs was picked up multiple times on the *same warrant* which was issued years prior and Hobbs had already cleared the warrant... years prior.

## The Unified Government Caused Plaintiff's Injuries

23

82.     The constitutional violations against Plaintiff were not anomalous or isolated acts of misconduct. They were intentional and/or resulted directly from the Unified Government's customs, policies, or practices, which fostered and enabled the conduct described in greater detail above.

83.     The similarity and pattern of the rapes, sexual assaults, and mistreatment of vulnerable **Black women** in KCK by the Unified Government's employees further evidences the Unified Government's customs, policies, or practices. In fact, so numerous and so notorious are the rapes by Unified Government employees in KCK, that Golubski alone has been indicted *twice*,[7] and a local newspaper reporter won a Pulitzer Prize for her coverage of corruption and rape in the Unified Government.[8] In a Motion for Detention, the Government alleged 7 additional victims, all with eerily similar allegations – *and the Government is still investigating more victims.*[9]

84.     The Unified Government, by and through its final policymakers, not only knew about this conduct, the informal policies and customs that were enacted under their watch permitted this conduct by Unified Government employees.

85.     Despite its actual or constructive notice of these constitutional violations, the Unified Government refused and/or failed to make any meaningful investigation into the charges that its employees committed the misconduct described above.

86.     The Unified Government, by and through its final policymakers, also had actual or constructive notice that widespread and systematic failures to train, supervise, or discipline its employees for misconduct, including rape and sexual assault of citizens, enabled its police officers to engage in misconduct without repercussion. The Unified Government's continued adherence to

---

[7] *USA v. Golubski*, Case No. 5:22-cr-40055-TC-RES (6 counts, including sexual assault, sexual abuse, and kidnapping) ("Golubski Criminal Rape Case"); *USA v. Brooks, et al.*, Case No. 5:22-cr-40086-TC-RES (2 counts, including sexual assault, sexual abuse, and kidnapping) ("Golubski Criminal Sex Trafficking Case").
[8] https://www.pulitzer.org/winners/melinda-henneberger-kansas-city-star.
[9] Golubski Criminal Rape Case, Government's Memorandum and Proffer in Support of its Motion for Pretrial Detention [DOC 10].

these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of Plaintiff and similar Black women.

### Informal policies, procedures, and customs created widespread practice of police abusing government authority

87.     The Unified Government, by and through its final policymakers, at all times relevant to this Complaint and covering over a decade, maintained informal policies, procedures, and/or customs that permitted police (including Detective Defendants) to (i) kidnap, coerce, pressure, sexually assault, and rape Black women; (ii) utilize improper investigative practices to obtain wrongful convictions in order to support and further a government-sanctioned protection racket; and (iii) discourage, prevent, and fail to investigate complaints of police misconduct.

#### *Kidnapping, Coercing, Pressuring, Sexually Assaulting, and Raping Black Women*

88.     Before 1992 and beyond 2006, the Unified Government, by and through its final policymakers, had informal policies, procedures, and customs of encouraging or knowingly permitting certain favored employees, including Detective Defendants, to kidnap, coerce, pressure, sexually assault, and rape Black women in violation of clearly established constitutional rights.[10]

89.     In addition to the factual allegations of Plaintiff, as detailed above, there are other Black female victims of the Unified Government's employees whose experiences so closely mirror Plaintiff's allegations that they evidence the Unified Government's informal policies, procedures, and customs, including:

    a.     E.A. who first met Golubski in the early 1990s while he was investigating a murder at her workplace. He became obsessed with her, falsely accused her of being involved with a different murder (as a pretense to talk to her), and repeatedly called her at home, once pretending

---

[10] *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Long v. Laramie Cnty. Cmty. Coll. Dist.*, 840 F.2d 743 (10th Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988).

to be a rapist. Golubski stalked E.A. continually, until she agreed to marry him if he took care of her financially. She divorced him after learning about his sexual involvement with witnesses. Following the divorce, Golubski continued to stalk her for 10 years. When he later assaulted her in her car, in defiance of an order of protection, KCKPD refused to discipline Golubski.

b.       Golubski had a regular relationship with D.L. and used her for sex and information. She knew, as most other women in KCK knew, that when Golubski came around the "Bottoms," she either had to provide sexual services to Golubski or get arrested.

90.     Indeed, at shift changes, officers openly joked about children that Golubski was reputed to have fathered with prostitutes. When one of Golubski's alleged daughters was arrested, the arresting officer placed a courtesy call to Golubski to notify him.

91.     Detective Defendants also used terror to reinforce the community's belief in their unlimited authority. Their regular acts of humiliation and exploitation included:

a.       Entering residents' homes in the low-income projects at will and threatening to arrest females' boyfriends if they did not have sex with Detective Defendants or provide information. Sometimes, even the woman's compliance was not enough to deter Detective Defendants from arresting the boyfriends of vulnerable women;

b.       Following Black men around the community, harassing and threatening them, and stealing their money and drugs;

c.       Fostering and encouraging the illegal drug trade and prostitution in KCK in order to skim money from known drug dealers, as represented by Detective Bye's common refrain that "A dead nigger doesn't make me money. But a live nigger on the street? That makes me money."

d.       Picking up Black women in police cars and openly driving around with them in the community, exposing them as informants and as victims of his sexual assaults;

26

     e.     Engaging in acts of humiliation, including an incident recalled by affiant Gregory Wilson, who described how Golubski once conducted a search of a man's groin by forcing him to drop his pants and lift his testicles in front of a crowd of 20 or 30 people;

     f.     Leading other officers to the "Bottoms" to pick up prostitutes, and hunting for the younger women, those in their 20s and even younger, who were known to be Golubski's favorites and knew they had to comply with the officers' demands for sex or be arrested; and

     g.     Acting out of personal animus and targeting particular individuals for retribution.

92.     The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiff's and other victims' constitutional rights.

### *Improper Investigative Practices to Obtain Wrongful Convictions and Support the Government-Sanctioned Protection Racket*

93.     Before 1992 and beyond 2006, the Unified Government, by and through its final policymakers, had informal policies, procedures, and customs of encouraging or knowingly permitting certain favored employees, including Detective Defendants, to utilize improper investigative practices to obtain wrongful convictions in order to support the government-sanctioned Protection Racket in violation of clearly established constitutional rights.[11]

94.     Specifically, the Protection Racket, including Detective Defendants, regularly engaged in the improper and illegal acts described above in order to obtain unreliable and often falsified evidence in order to close cases and obtain wrongful convictions. Using force, threats, and

---

[11] *United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); *United States v. Brown*, 555 F.2d 407 (5th Cir. 1977); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.); *United States v. Gwaltney*, 790 F.2d 1378 (9th Cir. 1986), *cert. denied*, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987).

illegal inducements, Detective Defendants developed a large network of poor, often drug-addicted Black women whom they used as "informants." Some women were homeless or worked as prostitutes, others were children as young as 13 years old. The rest simply had the misfortune of being Black in KCK.

95.     To operate their informant network, Detective Defendants and the Protection Racket used drugs and money (that they regularly stole from lower-level drug dealers or were given as payment from drug dealers receiving protection) to pay vulnerable, and often underage, Black women in exchange for sex and testimony. Detective Defendants' practice of providing drugs and money to addicted women was well-known to the Unified Government, including Police Chief Defendants. The Unified Government, including Police Chief Defendants, also knew that Detective Defendants drove in their police vehicles with these women and forced them to perform sex acts while Detective Defendants were on duty. In fact, Golubski regularly picked up his informants, including Black women he enslaved and trafficked, in his official police vehicle and drove them around KCK where he was seen by citizens and countless Unified Government officials. Golubski also openly had sex with Black women in his police vehicle and his office at police headquarters.

96.     In turn, criminals paid the Protection Racket to provide this shield from criminal investigation, arrest, and prosecution and instead obtain wrongful convictions. Drug dealers in KCK sold drugs and protected their turf and business interests through violent acts, including assault, kidnapping, and murder. Although these acts were well known and sometimes reported to KCKPD, the high-level dealers consistently avoided any criminal sanction because the Protection Racket protected them from arrest and provided advance notice of investigations and raids.

97.     Golubski was known to be especially close to Cecil Brooks, and they were often seen speaking together, either in Golubski's car, Brooks' office in the Delavan Apartments, or secluded

areas. Although Cecil Brooks was known throughout the community as an open and notorious dealer of crack cocaine throughout the 1990s and early 2000s, he escaped any criminal consequences while operating in KCK. The Protection Racket enabled criminal organizations to operate large, lucrative drug enterprises, and to engage in violent acts to protect their interests, such as the murder of Saundra Newsome's son, Doniel Quinn.

98.     Ruby Ellington, a retired officer who served in the vice unit, attested that although she and other officers repeatedly tried to bring charges against Brooks, he was "always clean" when they stopped him, indicating that KCKPD officers were warning Brooks about investigations. On November 10, 2022, the United States of America unsealed a grand jury indictment regarding Brooks' and Golubski's conspiracy.[12] In it, the Government alleges that Golubski conspired with Brooks and others by providing protection from law enforcement investigation and intervention into the criminal offenses, including sex trafficking, at the Delavan Apartments.

99.     The Unified Government, by and through its final policymakers, knowingly permitted this misconduct and allowed the use of improper investigative practices to close cases while expending little or no effort to try to determine whether the real perpetrators of crimes had been investigated and convicted. Instead, the Unified Government rewarded this behavior, praising and promoting Detective Defendants, including Golubski and Ziegler.

100.     Indeed, the Unified Government, by and through its final policymakers, knew that if a conviction was needed, Detective Defendants and the Protection Racket would obtain it. The Unified Government accepted and permitted Detective Defendants to jealousy guard the identifies of their "informants," including the identity of "Golubski's Girls," who the Unified Government knew Golubski controlled with violence, sexual assault, rape, and threats.

---

[12] Golubski Criminal Sex Trafficking Case, DOC 1.

101.    The Unified Government, by and through its final policymakers, also knew that Detective Defendants traded their ability to "fix" criminal charges in exchange for sexual favors and information. These "trades" were encouraged and assisted by Detective Defendants' supervisors, including Police Chief Defendants.

102.    Despite the bulk of Detective Defendants' information coming from informants who had been coerced, bribed, and victimized, the Unified Government used this unreliable information to investigate criminal matters, close cases, protect notorious drug gangs, and falsely convict innocent citizens. Indeed, the exploitation of vulnerable Black women as an investigatory "tactic" was so widespread, open, and notorious that many people (including Unified Government employees and KCKPD detectives, officers, and supervisors, including a Chief of Police) have attested under oath that they knew about the misconduct. Given its open and notorious nature, anyone familiar with KCKPD was aware of the issue. In fact, the conduct was so pervasive and known that the Kansas State Legislature House Judiciary Committee passed a bill criminalizing it.[13]

103.    The improper investigative practices included, but were not limited to, (a) using misleading and improperly suggesting photo lineups; (b) obtaining identifications (including knowingly false identifications) through manipulative and coercive means; (c) feeding information to eyewitness or indicating whom they should identify; (d) manipulating or coercing witnesses into making false or fabricated statements; (e) failing to document or disclose exculpatory evidence; (f) failing to document witness statements and instead relying solely on an officer's claims about what the witness said; (g) failing to gather or analyze critical physical evidence; and (h) deliberately failing to follow obvious leads or use legitimate and accepted investigative practices.

---

[13] https://www.kansas.com/news/politics-government/article210902319.html (later signed into law).

104.    Other Black female victims' experiences mirror those of Plaintiff. For example, T.B. was the friend of a murder victim whom Golubski attempted to coerce into giving information related to the crime. T.B. knew nothing about a particular murder, but Golubski interrogated her anyway, frightening her with sexual advances. He later stalked her at home and work.

105.    Detective Defendants also repeatedly failed to disclose to criminal defendants that they had sexual contact with witnesses, or that the information they obtained from their "informants" was obtained through coercion via the practices described above.

106.    For example, Golubski and others committed multiple improper investigative practices in order to falsely convict LaMonte McIntyre.[14] This included coercing Quinn to perjure herself when she knew that McIntyre was not the murderer of her cousin. This served three purposes. First, the Protection Racket was able to protect the real killer. Second, the conviction gave Golubski leverage over McIntyre's mother, Rose, who Golubski was able to force to submit to his sexual perversions. Third, Golubski then used his role in the investigation as leverage to sexually assault and stalk Newsome.

107.    Similarly, Golubski, Ziegler, and others committed multiple improper investigative practices in order to falsely convict Williams' sons, Donnell and Ronnell. KCKPD coerced false murder confessions from the 14-year-old twins, who were interrogated by police officers without the presence of a guardian or lawyer after offering a *quid pro quo* of releasing their 13-year-old brother in exchange for the confessions. This again served two purposes. First, the Protection Racket was able to protect the real killer. Second, the confessions and convictions gave Golubski leverage to repeatedly rape and sexually assault Williams.

---

[14] For a detailed discussion of this improper conduct, see McIntyre, et al. v. Unified Government, et al., Case No. 2:18-cv-02545-KHV-KGG, Doc. 74.

108.    Golubski's improperly investigative practices included Jermeka, who served as one of "Golubski's Girls." Golubski forced Jermeka to sexually pleasure him while he forced her to provide him with information or to pass messages to organized criminals. Other Black women were used by Golubski too. For example, C.R. tried to avoid Golubski but ultimately was forced to have sex with him. Golubski provided C.R. with protection from arrest in return for frequent sexual favors. C.R. attested that "I did what I had to do to stay out of jail...I provided him with sexual favors in his vehicle." In another example, K.D. encountered Golubski while dealing drugs in the 1990s. Although Golubski typically shook down street-level dealers and took their drugs, he sometimes would purchase them. K.D. once sold crack cocaine to Golubski through an intermediary and then saw him enter a house to have sex with the woman who received the drugs. Later, Golubski approached K.D. for sex, offering police protection; telling her that he had "pull" and could get rid of any tickets for her.

109.    In 2010, while working as a Crime Scene Investigator for KCKPD, ____ Green was called to a double homicide. Despite not working on the case, Golubski arrived on the scene. Roughly at the same time, an individual known by Green to be a drug dealer also arrived and met with Golubski. The two spoke and began inspecting the crime scene and bodies. Green's KCKPD supervisors saw this occurring and did nothing to stop it.

110.    It was well known within the Unified Government that Golubski frequented known drug dealers and their dealing locations. Golubski was frequently seen taking cash from these criminals. Nevertheless, the Unified Government never tried to stop this conduct or discipline Golubski or other Detective Defendants.

111.    The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices and/or customs, in spite of their known and

32

obvious inadequacies and dangers, was deliberately indifferent to Plaintiff's and other victims' constitutional rights.

*Discouraging, Preventing, and Failing to Investigate Complaints of Misconduct*

112.    Before 1992 and beyond 2006, the Unified Government, by and through its final policymakers, had informal policies, procedures, and customs of discouraging, preventing, and failing to investigate complaints of misconduct, thus nonfeasance, in violation of clearly established constitutional rights.[15]

113.    KCKPD police officers, including Kobe, Seifert, Ellington, and Green, have attested to the existence of these policies, procedures, and customs in the Unified Government:

a.    Michael Kobe, a retired captain with KCKPD, reported Golubski's misconduct to his then-supervisor, Major Gary Wohlforth, but KCKPD did nothing to address the issue. Kobe, who was also Golubski's supervisor at one point, failed to document his concerns in writing, believing based on experience that complaints about Golubski's misconduct would not be taken seriously by those up the chain of command.

b.    Seifert sued the Unified Government after he was retaliated against for speaking out about KCKPD misconduct.[16]

c.    Ellington acknowledged that "Although some officers were disturbed about Golubski's misconduct, they were afraid to speak up. They knew that Golubski's activities with prostitutes were well known throughout the Department, but his misconduct was never acknowledged or punished."[17] Instead, "he rose steadily through the ranks and became a powerful

---

[15] *Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982); *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972); *Webb v. Hiykel*, 713 F.2d 405 (8th Cir. 1983); *Byrd v. Clark*, 783 F.2d 1002 (11th Cir. 1986).
[16] *Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, 779 F.3d 1141 (10th Cir. 2015).
[17] *Id.* at ¶ 18.

detective and, ultimately, a captain."[18] "Golubski was part of the 'in' group at the Department, and he never seemed to suffer any repercussions for his activities. Even if an officer had been willing to speak up and complain about Golubski, that officer knew that it would have done no good. Golubski was perceived as untouchable."[19]

        d.        Green experienced the Unified Government's policy and custom in action:

                i.        After graduating and being on the streets for 2-3 years as a patrol officer, citizens started approaching Green and alleging physical and emotional abuse, threats, and theft by KCKPD officers. Green would listen to these reports and encourage the citizens to contact Internal Affairs. Some of these civilians agreed to do so. But a far greater percentage either stated that they feared retaliation from KCKPD for reporting misconduct to Internal Affairs, or they had previously complained to Internal Affairs and were either refused the ability to make a report or the misconduct continued.

                ii.        Early in her career, Green made a complaint to her sergeant about two officers' misconduct toward a civilian. Green was discouraged from making the report, but nevertheless refused to withdraw it. Several days later, Green was dispatched to a domestic disturbance call. Due to safety concerns in such a scenario, Unified Government policy required backup to be dispatched too, which Green heard requested over the radio. But at the scene, Green's backup never arrived. Green was forced to handle the domestic disturbance alone and without any backup. After the call, Green discovered her backup sitting in his car several blocks away. Green understood KCKPD's message: if you report officer misconduct, you will be left exposed without adequate backup and abandoned in unsafe and dangerous conditions.

---

[18] *Id.*
[19] *Id.* at ¶ 18.

iii.     Green was approached by a Black male with visible bruises on his face. He explained that he was beaten by the "Umbrella Shift" night officers north of 18th Street past the cemetery and near the railroad tracks. After listening to his story, Green told the man to contact and file a report with Internal Affairs. The man replied that Internal Affairs would not do anything, because he had already gone to them before and nothing was done in response. It was unclear to Green whether the man's most recent beating was retaliation for filing a complaint with Internal Affairs.

114.   The Unified Government's policies, procedures, and customs were felt within the community by citizens too, including:

a.     Omitting Golubski's name, Ophelia Williams told her story to Sonny Cunningham, a KCKPD detective. Despite Cunningham being a family friend, Williams was still fearful of Golubski and his power and therefore consciously avoided using Golubski's name and instead spoke in generalities. Cunningham grew quiet, which Williams understood meant that Cunningham instantly knew the perpetrator was Golubski. Cunningham asked Williams if she had revealed it to anyone else. When Williams said no, Cunningham asked if Williams had filed a complaint. Williams said no and that she did not know how to file a complaint. Based on Cunningham's physical demeanor and responses, Williams understood she should drop the topic and never mention it again. As a result, she did did not mention it to Cunningham again, nor he to her.

b.     Rose McIntyre went to KCKPD Internal Affairs to complain about Golubski forcing her to submit to a sexual act, but she was refused the opportunity to even file a complaint. The Internal Affairs investigator told her "our officers don't do things like that." Ms. McIntyre was upset by the officer's statement, because she knew it was false and also knew that at least one witness

had seen her with Golubski. At police headquarters, when a police officer opened Golubski's office door and walked in on Golubski sexually assaulting Ms. McIntyre, the officer did not intervene; he simply backed out and shut the door.

      c.     In the 2000s, another woman was with Golubski in his office when a detective walked, finding Golubski with his fly unzipped and his groin not far from the woman's face. KCKPD supervisors learned of the incident but did nothing.

      d.     Golubski stopped N.H. under the guise that she looked like an aggravated battery suspect. He began paying her for sex and information on a regular basis. Golubski introduced N.H. to other KCKPD officers, who also paid her for sex. When an officer raped her at gunpoint after an arrest, she complained to KCKPD, but to her knowledge, the officer was never disciplined.

      e.     One KCKPD detective received a phone call from one of his informants, who told him in an upset tone that he had just seen Golubski up on the north end, buying sexual services from prostitutes. Nevertheless, no complaint was made nor any investigation opened.

      f.     Officers often witnessed Golubski leaving decrepit motels and low-income housing projects, where he was known to obtain sexual services from "informants" and other exploited women. On one notable occasion, Golubski was spotted in the north end, off duty, under suspicious circumstances. When a nearby patrol officer, acting under orders from his supervisor, pursued him, Golubski fled in his vehicle.

115.    By openly and notoriously committing the misconduct described above, Detective Defendants terrorizing of the Black community perpetuated the perception that Detective Defendants and the Unified Government could rape, steal, and murder without risk of exposure and prosecution. This aided Defendants' efforts to discourage complaints, and also ensured Plaintiff was too fearful to come forward with her allegations of abuse.

116.     Despite these and other complaints, and the open and notorious nature of Detective Defendants' misconduct, relevant Internal Affairs records are minimal. The few complaints that were logged were deemed unsubstantiated, most often because the complainant was deemed "not credible." Upon information and belief, this was a euphemism for "Black complainant." None of the many officers who witnessed or otherwise became aware of Detective Defendants' sexual activities and their exploitation of drug-addicted and unreliable informants submitted an internal complaint to Internal Affairs, and there is no record that any supervisor or commander attempted to deter Detective Defendants' sexual exploitation and misconduct.

117.     Although the Unified Government, including Internal Affairs and Police Chief Defendants, learned that Detective Defendants committed the misconduct described above, including raping and sexually assaulting citizens (including in police headquarters), it never stopped them, disciplined them, or even opened an investigation.

118.     The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiff's and other victims' constitutional rights.

**Failure to adequately train and supervise its employees permitted the conduct**

119.     The Unified Government, by and through its final policymakers, at all times relevant to this Complaint and covering decades, failed to adequately train and supervise its employees. As a direct result, Unified Government employees, including Detective Defendants, were permitted to commit the unlawful acts described above.

120.     The similar pattern of constitutional violations against Plaintiff and other Black women in KCK put the Unified Government on notice that its employees, including KCKPD and

Detective Defendants, needed training. Despite this, the Unified Government failed to provide any training or supervision in an effort to stop this misconduct. This constitutes deliberate indifference to the known previous and risk of future constitutional harms that its lack of training posed to citizens in KCK.

121.    The Unified Government failed to implement adequate training, guidelines, and supervision to: (1) deter sexual activity between officers and witnesses or informants; (2) ensure the physical and emotional safety of informants and protect them from exploitation; (3) protect the integrity, legitimacy and accuracy of investigations, prosecutions, and convictions; (4) using physically, mentally, or sexually exploited Black women as involuntarily informants and sex workers and to obtain unreliable and falsified "information"; and (5) ensure employees reported and disciplined misconduct by KCKPD police officers and detectives. The lack of adequate and appropriate supervision for police officers and detectives, and the failure to discipline and train them to report the misconduct of their colleagues, demonstrates a deliberate indifference toward the known risks that individuals would be accused and convicted of crimes that they did not do.

122.    The Unified Government, including Police Chief Defendants, knowingly permitted Detective Defendants to violate the constitutional rights of citizens with impunity. With little or no check on their conduct, Detective Defendants used the power of their badge and office to satisfy personal vendettas, protect favored individuals (including high-level drug dealers), and frame and falsely convict innocent people for the crimes of others. No supervisor and no Police Chief Defendant acted to prevent this through appropriate discipline or supervision, and there was no training provided to deter Detective Defendants from their constant and egregious violations of citizens' constitutional rights, or to require other employees to report their misconduct.

123. The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiff's and other victims' constitutional rights.

### Police officers readily admit the existence of the Unified Government's *de facto* policies and procedures

124. KCKPD police officers have attested to the existence of the Unified Government's policies, procedures, and customs. Three such examples are Max Seifert, Ruby Ellington, and Jackie Green.

125. Seifert, a retired KCKPD detective, sued the Unified Government after he was retaliated against for speaking out about KCKPD misconduct.[20] Seifert describes the KCKPD culture as treating homicide detectives as "sacred cows."[21] After a detective walked in on Golubski receiving oral sex from a Black female *inside KCKPD headquarters*, the Unified Government's response, communicated by KCKPD's then Chief of Police, was to call a meeting and simply ask, "Don't you guys have locks on your doors?" As Seifert stated: "It's like gravity. Corruption doesn't start from the bottom and go up. It starts from the top and comes down. That's corrupt…And when the guys in the ranks, the lower ranks, see the commanders doing whatever they want to do, and it's not right, then they think, 'Well, hey, why not?'"[22]

---

[20] *Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, 779 F.3d 1141 (10th Cir. 2015).
[21] NPR, *Deeper than Golubski: A culture of corruption defined the Kansas City, Kansas Police Department*, KCUR (November 23, 2022, 3:00 AM), https://www.kcur.org/news/2022-11-23/deeper-than-golubski-a-culture-of-corruption-defined-the-kansas-city-kansas-police-department.
[22] NPR, *Deeper than Golubski: A culture of corruption defined the Kansas City, Kansas Police Department*, KCUR (November 23, 2022, 3:00 AM), https://www.kcur.org/news/2022-11-23/deeper-than-golubski-a-culture-of-corruption-defined-the-kansas-city-kansas-police-department.

126.    Ellington, the first Black officer in the KCKPD,[23] agreed. In a sworn affidavit, Ellington stated that over decades:

    a.    Golubski had a reputation for being obsessed with Black female prostitutes who were typically drug-addicted, poor, and powerless,[24] and "Golubski's misconduct and his exploitation of [B]lack women was well known throughout the Department. Despite this, he was never punished. In fact, he rose steadily through the ranks and became a powerful detective and, ultimately, a captain."[25]

    b.    "Golubski had a reputation in the Department and the community for taking care of warrants and tickets for [B]lack prostitutes if they provided sexual favors. If a [B]lack female had any kind of criminal charge or other legal problem, Golubski would use that as leverage to get what he wanted."[26] "Everyone in the Department knew that when Golubski would go out on calls, that any [B]lack female involved would likely end up in his police car with him."[27]

    c.    "Golubski made no secret of his activities. In fact, it was well known in the Department and the community that he would get sexual favors from prostitutes in his police vehicle while he was on duty."[28]

    d.    "It was also widely known that Golubski was so involved with [B]lack female prostitutes and drug addicts that he fathered children with some of them...Roger Golubski's involvement with them was no secret, and no one seemed shocked that he had children with some

---

[23] NPR, *Deeper than Golubski: A culture of corruption defined the Kansas City, Kansas Police Department*, KCUR (November 23, 2022, 3:00 AM), https://www.kcur.org/news/2022-11-23/deeper-than-golubski-a-culture-of-corruption-defined-the-kansas-city-kansas-police-department.

[24] *McIntyre, et al. v. Unified Government, et al*, Case No. 2:18-cv-02545-KHV-KGG, Memorandum of Law in Opposition to Defendant Golubski's Motion for Summary Judgment, Exhibit 81, Affidavit of Ruby Ellington at ¶ 6 [DOC 605-53].

[25] *Id.*

[26] *Id.* at ¶ 8.

[27] *Id.* at ¶ 7.

[28] *Id.* at ¶ 10.

of these women. It was simply accepted as part of what Roger Golubski was able to do without repercussion."[29]

     e.     "Golubski does not attempt to hide these relationships or to conceal the fact that he is often in the housing projects for his own personal reasons, rather than law enforcement purposes. In fact, during meetings of the Black Police Officers Association, which were held in a meeting room at Gateway [housing project], the officers in the association would sometimes see Golubski driving through the project."[30]

127.    Ellington also attested to the Unified Government's role in preventing reports and failure to disciple Golubski, despite knowledge of his conduct. "Although some officers were disturbed about Golubski's misconduct, they were afraid to speak up. They knew that Golubski's activities with prostitutes were well known throughout the Department, but his misconduct was never acknowledged or punished."[31] "Golubski was part of the 'in' group at the Department, and he never seemed to suffer any repercussions for his activities. Even if an officer had been willing to speak up and complain about Golubski, that officer knew that it would have done no good. Golubski was perceived as untouchable."[32]

128.    Green, a former KCKPD crime scene investigator ("CSI"), was the only Black woman in her KCKPD Police Academy class. Green's experiences further evidence the Unified Government's knowledge of Defendants' conduct and their policy to enable this unlawful conduct:

     a.     After graduating and being on the streets for 2-3 years as a patrol officer, citizens started approaching Green and alleging physical and emotional abuse, threats, and theft by KCKPD officers. Green would listen to these reports and encourage the citizens to contact KCKPD

---

[29] *Id.* at ¶ 15.
[30] *Id.* at ¶ 17.
[31] *Id.* at ¶ 18.
[32] *Id.* at ¶ 18.

Internal Affairs. Some of these civilians agreed to do so. But a far greater percentage either stated that they feared retaliation from KCKPD for reporting misconduct to Internal Affairs, or they had previously complained to Internal Affairs and were either refused the ability to make a report or the misconduct continued.

        b.      While working as a patrol officer, Green would frequently stop Black women suspected of carrying drugs or working as prostitutes. These women would pull out their cell phones and make a call. Soon thereafter and unrequested by Green, Golubski would arrive on the scene and either demand that Green let the woman go or take the woman into Golubski's custody and leave. Because Golubski was a detective and Green a patrol officer, KCKPD and its hierarchy required Green to cede to Golubski's authority.

        c.      It was common knowledge within KCKPD and the Unified Government that the most corrupt non-detective police officers desired to work in the 7:00 p.m. – 3:00 a.m. "Umbrella Shift." These police officers wore all black uniforms during the dead of night.

        d.      While working the CSI night shift – 11:00 p.m. to 7:00 a.m. – Black women would frequently come to the back loading dock door and ring a bell to be let in. When Green would answer the door, the women would ask for Golubski by name. Many of these Black women appeared to be vulnerable and/or drug addicts. But Green never had to retrieve Golubski. Typically, either Golubski or Ziegler would meet the Black women at the back door and lead them upstairs to the detective offices.

        e.      It was common knowledge within KCKPD and the Unified Government that police officers used apartments within government-subsidized housing (a/k/a "the projects") to have sex with vulnerable and trafficked Black women.

f.      It was common knowledge within KCKPD and the Unified Government that Golubski routinely took his detective car across state lines from KCK to Kansas City, Missouri. Termed "going across the water," traveling across state lines and into other police jurisdictions (outside of a police pursuit) with a police car required preauthorization from the Chief of Police and the foreign jurisdiction's police chief. Despite this requirement, Golubski frequently would "go across the water" to collect Black women in Missouri and transport them back to KCK.

### Decisions by Chiefs of Police encouraged further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse

129.    Despite knowledge of the foregoing, the Unified Government and Police Chief Defendants continued to reward and promote, rather than discipline, Detective Defendants and ratified unconstitutional conduct which fostered a culture of abuse.

130.    For example, despite knowledge that his informants were not only sexually exploited but also (in some cases) drug-addicted and unreliable, Golubski was put in charge of increasingly serious cases, rising to be head of the "major cases." At the time of his "retirement," Golubski had risen to the rank of Captain.

131.    Similarly, despite his involvement with Golubski and own improper conduct, Ziegler continued to rise and receive promotions, ultimately becoming a Chief of Police. This status permitted Ziegler to aid the Protection Racket and shield it from liability.

132.    Seifert recounts that when a detective walked in on Golubski receiving oral sex inside KCKPD headquarters, then-Chief of Police ratified the unconstitutional conduct by simply asking "Don't you guys have locks on your doors?"[33]

---

[33] NPR, *Deeper than Golubski: A culture of corruption defined the Kansas City, Kansas Police Department*, KCUR (November 23, 2022, 3:00 AM), https://www.kcur.org/news/2022-11-23/deeper-than-golubski-a-culture-of-corruption-defined-the-kansas-city-kansas-police-department.

133.    The Unified Government also ratified other unconstitutional conduct by permitting it to occur openly and brazenly for decades without any repercussions. As a result, the community viewed Detective Defendants as both enormously powerful and able to indiscriminately commit crimes against them.

134.    The Unified Government, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiff's and other victims' constitutional rights.

<u>DAMAGES</u>

135.    As a direct result of the aforementioned program of terror and conspiracy with drug cartels, lasting over the course of decades, inflicted through Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Plaintiff sustained injuries and damages, which continue to date and will continue into the future, including: physical pain and suffering; severe mental anguish; emotional distress; destruction of family relationships; destruction of community; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; and permanent loss of natural psychological development, for which Plaintiff is entitled to monetary relief.

136.    Additionally, the emotional pain and suffering caused by Defendants has been substantial. Since her assaults, Plaintiff has been stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right, including the fundamental freedom to live one's life as an autonomous human being without fear that the police will rape, sexually assault, and/or kill one.

137.    Because of the foregoing, Plaintiff has suffered tremendous damage, including, but not limited to, physical harm, mental suffering, and loss of a normal life, all proximately caused by Defendants' misconduct. These damages continue to date and will continue into the future.

### DEFENDANTS CONDUCT HAS TOLLED ANY STATUTES OF LIMITATION

138.    "To decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has…frequently been employed to bar inequitable reliance on statutes of limitations."[37]

139.    Defendants used systematic illegal violence to provoke a state of terror, with the intention of achieving control over the Black community in KCK generally and Plaintiff specifically, by destroying her will to resist.

140.    Defendants, who knew their conduct was unlawful and tortious, and had a duty to protect and serve, concealed the existence of Plaintiff's claims, affirmatively induced Plaintiff to delay bringing her claims, and actively prevented Plaintiff from asserting her claims through their acts, representations, admissions, and silence when it was their duty to speak, including:

a.    Misrepresenting that Defendants were entering Plaintiff's home for official police business, including criminal investigations;

b.    Misrepresenting an ability to influence criminal matters important to and involving Plaintiff if Plaintiff did not tell anyone or otherwise publicize Defendants' conduct;

c.    Parading Plaintiff around and ensuring community members saw Plaintiff with Defendants, so that Plaintiff would be socially ostracized and expelled from their community and social groups as "rats" or "snitches";

---

[37] *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-33, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959).

d.      Wearing police badges and firearms to reaffirm that Plaintiff remained in danger and under the eye of government officials should they tell anyone or otherwise publicize Defendants' conduct;

e.      Stalking Plaintiff so that Defendants could randomly appear in unexpected places, and touting that Defendants were powerful state actors with powerful friends, both in order to reinforce Defendants' omnipotence and their watching of Plaintiff;

f.      Forcing Plaintiff to enter Defendants' police cars to reaffirm Defendants' control over Plaintiff;

g.      Repeatedly telling Plaintiff and/or implying that no one would believe them over the word of a powerful police officer;

h.      Researching Plaintiff's family and homes to make threats on Plaintiff's family and appear at Plaintiff's new homes after they moved in order to reaffirm that Defendants knew everything about Plaintiff, Plaintiff could not hide from Defendants, and neither Plaintiff nor her family would ever be safe if they told anyone or otherwise publicized Defendants' conduct;

i.      Threatening victims that if they told anyone about the rapes and sexual assaults, something violent would be done to them, and their bodies would never be found;

j.      Threatening to shoot victims if they resisted Defendants' sexual assaults and rapes;

k.      Threatening to "put a case" on victims' family members if they told anyone or otherwise publicized Defendants' conduct; and

l.      Threatening to take away victims' children and jail victims if they did not comply with Defendants' demands.

141.   Despite a desire to diligently pursue their claims, Plaintiff was prevented by Defendants' conduct.

142.   Plaintiff acted in reliance upon Defendants' representations and conduct in that she reasonably believed that her and their family would be harmed, killed, or set up for a criminal matter for which they were innocent, or that Defendants would interfere with Plaintiff's and their families' criminal matters.

143.   Plaintiff's reliance on Defendants' conduct and statements was reasonable, and as a direct result of each, Plaintiff did not pursue her claims or otherwise publicize Defendants' conduct. This detrimental reliance and the duress exerted by Defendants meant that Plaintiff kept quiet about Defendants' conduct for decades – even as news reports began surfacing. Indeed, particularly because after years of rumor, public discussion, even intensive news report, nothing happened and Detective Defendants remained open, notorious, and free, Plaintiff believed Defendants were above the law and remained positioned to retaliate against her or her family if Plaintiff did come forward with the truth of Defendants' conduct.

144.   It was not until September 2022, when the FBI arrested Golubski and criminal charges were brought that Plaintiff believed it was safe *enough* to finally come forward and seek the assistance of counsel to assert these claims.

145.   Defendants made their representations and threats in order to discourage and prevent Plaintiff from bringing claims against Defendants.

146.   Defendants further concealed their conduct by affirmative act(s) that were designed and/or planned to prevent inquiry, escape investigation, and prevent subsequent discovery of Defendants' conduct in that they:

a.      Ensured their police-issued firearm and police badge were visible to Plaintiff before, during, and after their rapes and/or sexual assaults of Plaintiff;

b.      Wore business casual clothing and a suit jacket or blazer to identify themselves as someone with more authority than ordinary uniformed police officer;

c.      Ensured they were seen with and/or implying they were associated with powerful criminal gangs so that Plaintiff knew Defendants also had the backing of and were part of criminal conspiracies that operated unchecked and unrestrained by the Unified Government;

d.      Offered prostitutes and other victims up to other police officers to buy their silence and implicate them in their unlawful conduct; and

e.      Ensured they were visibly seen with victims in order to assert dominance and immunity.

147.    The Unified Government and Police Chief Defendants took affirmative steps to further conceal their and Detective Defendants' misconduct by, including, but not limited to, depressing complaints made by victims by flatly refusing to accept their complaints, imposing onerous reporting requirements on them, and fostering a culture wherein other officers were intimidated and discouraged from reporting Detective Defendants' conduct or otherwise did not take those complaints seriously.

148.    The Unified Government and Police Chief Defendants also misrepresented that Detective Defendants' conduct was proper, including, without limitations, by refusing to discipline Detective Defendants; promoting and furthering Detective Defendants' career; deeming complaints about Detective Defendants "not credible"; and knowingly allowing Detective Defendants to continue to terrorize KCK's Black women when they knew of the pervasive, unlawful, abusive, and racist conduct.

149.    Defendants' conduct stood in the way and prevented Plaintiff from timely filing her claims because she was fearful of her life, the lives of her family, and of Defendants' falsely convicting each for crimes they did not commit as retribution for speaking out.

150.    Because Plaintiff was "trapped in a fog of misapprehension of their true rights,"[38] Defendants' actions and inactions and the duress they exerted over Plaintiff means Defendants are equitably estopped from asserting a statute of limitation defense, and the statutes of limitation for Plaintiff is tolled.

151.    As part of Defendants' wrongful attempt to conceal their propensity to sexually abuse poor Black women and their past sexual abuse from public scrutiny and criminal investigation, Defendants implemented various measures with the intent and effect of making Defendants' conduct harder to detect and ensuring that other victims with whom they came into conduct, including Plaintiff, would be sexually abused and assaulted, including:

a.    Permitting Detective Defendants to remain in a position of authority and trust after the Unified Government and Detective Defendants knew or should have known that Detective Defendants were raping and sexually assaulting their victims;

b.    Promoting Detective Defendants into higher positions with more serious criminal investigations, including putting Golubski in charge of "major crimes" and installing Ziegler as Chief of Police;

c.    Placing Detective Defendants without a workplace monitor and granting them unfettered access to and control over the individuals, victims, and "informants," thereby allowing Detective Defendants to physically and sexually interact with poor Black women, including Plaintiff;

---

[38] *Bistline v. Parker*, 918 F.3d 849, 883 (10th Cir. 2019).

49

      d.    Holding out Detective Defendants to Plaintiff, other Black women, Wyandotte County citizens, and the public at large as trustworthy people of good moral character who were capable and worthy of being granted unsupervised access to Black women with a police badge and a police-issued firearm;

      e.    Failing to disclose and actively concealing Detective Defendants' prior record of misconduct, sexual abuse, harassment, and rape, and their propensity to commit such acts towards at-risk Black women, from constituents, the public at large, and other law enforcement;

      f.    Failing to investigate or otherwise confirm or deny such facts about Detective Defendants, including prior complaints, claims, and investigations relating to sexual abuse Detective Defendants committed;

      g.    Failing to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Detective Defendants, such as by avoiding placement of Detective Defendants in functions or environments in which they would necessarily have intimate contact with females; and

      h.    Failing to implement systems or procedures to supervise or monitor officers to ensure that they did not rape or sexually assault citizens in Detective Defendants' care or charge, and, further that they report all reasonable suspicions of sexual assault or battery to law enforcement.

152.    At all times pertinent to this action, Detective Defendants were agents, apparent agents, servants, and employees of the Unified Government and operated within the scope of their employment and their negligence is imputed to the Unified Government.

153.    Defendants engaged in, joined in, and conspired with each of the other Defendants and wrongdoers in carrying out the tortious and unlawful activities herein described. Each Defendant is legally responsible for the occurrences herein alleged, and Plaintiff's damages, as herein alleged, were proximately caused by all Defendants.

154.    The terroristic violence created, cultivated, and fostered by Defendants was felt throughout KCK for decades. Systemic corruption crippled KCK, where children are told "Beware of Golubski." "They don't trust the police, and there's a lot of people who came forward to say 'hey, this is going on in our community.' And nothing was done about it."[39] In fact, even Cecil Brooks is afraid to talk about Golubski, knowing his connections, even today, throughout KCK: "I gotta get out of [prison] someday. I'm not messing with [Golubski]."[40]

155.    Since Golubski's indictment, Ms. Hobbs has experienced harassment, her home has been broken into, her brake lines in her vehicle were cut, and she has been followed[41].

156.    Ms. Hobbs, whose identity as a potential witness and claimant was known to Golubski prior to these events, believe these coordinated events were intended to emphasize that she is being watched by Defendants and warn her to stop her pursuit of justice for the wrongs committed against her and other victims. And the threats are working – Ms. Hobbs moved out of Kansas City, Kansas and is fearful of being out in public and coming home.

## CLAIMS FOR RELIEF

157.    The Civil Rights Act of 1871 was the country's first civil rights law. It was instigated by President Grant's dire message to Congress on March 23, 1871 that the Ku Klux Klan through Jim Crow's precursor, "Black Codes," was depriving citizens of their constitutional rights, privileges, and immunities.[42]

---

[39] The Kansas City Star, *Ex-KCK cop Golubski had ties to criminals, prosecutors say. Was he their 'protector'?*, The Kansas City Star (November 2, 2022, 5:00 AM), https://www.kansascity.com/news/local/crime/article267104436.html#storylink=cpy
[40] The Kansas City Star, *Ex-KCK cop Golubski had ties to criminals, prosecutors say. Was he their 'protector'?*, The Kansas City Star (November 2, 2022, 5:00 AM), https://www.kansascity.com/news/local/crime/article267104436.html#storylink=cpy
[41] In *Houcks, et al. v. Unified Government of Wyandotte County and Kansas City Kansas et al.*, Case No. 2:23-cv-02489, currently pending in the United Stated District Court for the District of Kansas, has similar claims, and Plaintiffs in that matter have experienced similar treatment, harassment, and threats.
[42] *Monroe v. Pape*, 365 U.S. 167, 172-73, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961).

158.     During debates on the law, Representative David Perley Lowe of Kansas underscored Congressional motivation:

> "While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress."[43]

159.     Years later in *Monell*, the Supreme Court of the United States held that municipal entities, like the Unified Government, may be sued under the Civil Rights Act of 1871 when their policies, customs, or practices cause the constitutional injury at issue.[44]

160.     The Trafficking Victims Protection Act ("TVPA") creates civil liability for those who commit or benefit from forced labor or services or sex trafficking and trafficking-related offenses. Violations of the TVPA include: forcing one into labor or sexual services; knowingly benefiting from such forced labor or services; recruiting or transporting one for labor or services against their will, especially if those actions include sexual abuse; attempting or committing these trafficking offenses; conspiring to commit these trafficking offenses; obstructing or interfering with efforts to enforce the TVPA; and benefitting financially from these offenses.

161.     The TVPA expressly authorizes civil remedies against both the perpetrator and those who knowingly benefited, attempted to benefit, or conspired to benefit from violations of the TVPA.[45]

---

[43] *Monroe v. Pape*, 365 U.S. 167, 175, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961).
[44] *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, Syl. ¶ 2, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).
[45] 18 U.S.C. § 1595(a) (as amended by Abolish Trafficking Reauthorization Act of 2022, PL 117-347, January 5, 2023, 136 Stat 6199).

162.    Each Defendant benefitted financially and/or received something of value from the misconduct detailed above. As a result, under the Civil Rights Act of 1871 and the Trafficking Victims Protection Act, Defendants are liable for the following causes of action:

## COUNT 1
### Forced Labor in Violation of 18 U.S.C. § 1589(a)
#### (AGAINST GOLUBSKI, UNIFIED GOVERNMENT, MILLER, BRESHEARS, ARMSTRONG, HANSON, AND ZIEGLER)

163.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

164.    Hobbs is authorized to bring this claim against these Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

165.    Golubski knowingly obtained the forced sexual labor or services of Hobbs by means of force, threats of force, physical restraint, or threats of physical restraint to Hobbs; by means of serious harm or threats of serious harm to Hobbs; by means of abuse of threatened abuse of law or legal process; and by means a scheme, plan, or pattern intended to cause Hobbs to believe that if Hobbs did not perform such sexual labor or services for Golubski, Hobbs would suffer serious harm or physical restraint.

166.    The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler knowingly benefited, or attempted or conspired to benefit, from participation in a venture with Golubski, knowing or in reckless disregard of the fact that the venture was engaged in the providing or obtaining of Hobbs' sexual labor or services by means of force, threats of force, physical restraint, or threats of physical restraint to Hobbs; by means of serious harm or threats of serious harm to Hobbs; by means of abuse of threatened abuse of law or legal process; and by means a scheme, plan, or pattern intended to cause Hobbs to believe that if Hobbs did not perform such sexual labor or services for Golubski, Hobbs would suffer serious harm or physical restraint.

167.    The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler each knowingly benefited, or attempted or conspired to benefit, from participating in a venture with Golubski despite knowing (or each should have known) Golubski was engaged in violations of the TVPA.

168.    The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler each knew or recklessly disregarded the fact that Golubski was obtaining Hobbs' forced sexual labor or services, and each participated in Golubski's scheme to force Hobbs to provide sexual labor or services to him. Each knew or should have known the conditions under which Golubski was using Hobbs as one of "Golubski's Girls," and participated in the venture with Golubski by each providing knowing and substantial assistance to him when it knew or should have known that Hobbs was being subjected to forced sexual labor or services and that she was being abused, raped, and sexually assaulted.

169.    The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler benefited from Golubski's actions, including, but not limited to, by obtaining false convictions in criminal matters, reducing its outstanding and unsolved crime rates, and avoiding media, social, legislative, and federal criticism and oversight due to publicity of Golubski's conduct and each's participation in the scheme or venture with Golubski.

170.    As a direct and proximate result of these Defendants' actions, Hobbs has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

171.    Hobbs claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 2
### Trafficking with Respect to Involuntary Servitude or Forced Labor in Violation of 18 U.S.C. § 1590(a)
### (AGAINST GOLUBSKI, UNIFIED GOVERNMENT, MILLER, BRESHEARS, ARMSTRONG, HANSON, AND ZIEGLER)

172.   The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

173.   Hobbs is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

174.   Golubski knowingly recruited, harbored, transported, provided, or obtained Hobbs for sexual labor or services for himself.

175.   The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler knowingly benefited, or attempted or conspired to benefit, from participation in a venture with Golubski for his knowing recruiting, harboring, transporting, providing, or obtaining Hobbs for sexual labor or services for Golubski.

176.   As a direct and proximate result of these Defendants' actions, Hobbs has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

177.   Hobbs claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 3
### Sex Trafficking by Force, Fraud, or Coercion in Violation of 18 U.S.C. § 1591(a)
### (AGAINST GOLUBSKI, UNIFIED GOVERNMENT, MILLER, BRESHEARS, ARMSTRONG, HANSON, AND ZIEGLER)

178.   The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

179.     Hobbs is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

180.     Golubski knowingly, in or affecting interstate commerce (including, but not limited to, use of phone calls and interstate highway system), recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and/or solicited Hobbs to engage in a commercial sex act. Golubski knew or was in reckless disregard to the fact that means of force, threats of force, fraud, or coercion (including abuse or threatened abuse of the law or the legal process) were used to cause Hobbs to engage in a commercial sex act.

181.     The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler knowingly benefited either financially and/or by receiving anything of value, from participating in a venture with Golubski regarding Golubski's recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, and/or soliciting of Hobbs to engage in a commercial sex act in or affecting interstate commerce (including, but not limited to, use of phone calls and interstate highway system). The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler knew or were in reckless disregard to the fact that means of force, threats of force, fraud, or coercion (including abuse or threatened abuse of the law or the legal process) were used to cause Hobbs to engage in a commercial sex act.

182.     The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler each knowingly benefited, or attempted or conspired to benefit, from participating in a venture with Golubski despite knowing (or each should have known) Golubski was engaged in violations of the TVPA.

183.     The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler benefited from Golubski's actions, including, but not limited to, by obtaining false convictions in

56

criminal matters, reducing its outstanding and unsolved crime rates, and avoiding media, social, legislative, and federal criticism and oversight due to publicity of Golubski's conduct and each's participation in the scheme or venture with Golubski.

184.    As a direct and proximate result of these Defendants' actions, Hobbs has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

185.    Hobbs claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 4
### Obstruction, Attempted Obstruction, Interference with Enforcement in Violation of 18 U.S.C. § 1590(b) and 18 U.S.C. § 1591(d)
### (AGAINST GOLUBSKI, UNIFIED GOVERNMENT, MILLER, BRESHEARS, ARMSTRONG, HANSON, AND ZIEGLER)

186.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

187.    These Defendants obstructed, attempted to obstruct, interfered with, and/or prevented the enforcement of 18 U.S.C. § 1590 and 18 U.S.C. § 1591 by:

      a.    Ignoring verbal and written complaints of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

      b.    Dismissing complaints of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

      c.    Refusing to act on reports of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

      d.    Delaying the investigation of reports of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

e. Advising, encouraging, and/or forcing victims to withdraw complaints of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services when they knew the complaints may or were truthful;

f. Offering to pay victims with money, drugs, police protection, eliminating warrants or tickets, reducing criminal liability, and/or securing housing if victims withdrew or failed to make truthful complaints of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

g. Threatening victims with consequences for considering, making, or failing to withdraw complaints of involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

h. Making false statements about victims and their families;

i. Retaliating against victims who complained or rebuffed any involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services by creating false evidence to convict victims or their family;

j. Delaying investigating or imposing restrictions and/or suspensions on Golubski and/or the other Detective Defendants;

k. Failing to contact law enforcement immediately upon knowing that Golubski and other Detective Defendants engaged in involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services;

l. Failing to provide the Kansas Bureau of Investigations and/or the Federal Bureau of Investigations with immediate, timely, and detailed reports and documents regarding the numerous involuntary servitudes, sexual abuses, rapes, trafficking, and forced labor and services committed by Golubski and the other Detective Defendants; and

58

m.    Other conduct involving involuntary servitude, sexual abuse, rape, trafficking, and forced labor and services, as provided in greater detail above.

188.    In the alternative, these Defendants knowingly benefited, or attempted or conspired to benefit, from participation in a venture with any one of these other Defendants in order to obstruct, attempt to obstruct, interfere with, and/or prevent the enforcement of 18 U.S.C. § 1590 and 18 U.S.C. § 1591, as detailed in the foregoing paragraph.

189.    The Unified Government, Miller, Breshears, Armstrong, Hanson, and Ziegler each knowingly benefited, or attempted or conspired to benefit, from participating in a venture with Golubski despite knowing (or each should have known) Golubski was engaged in violations of the TVPA.

190.    As a direct and proximate result of these Defendants' actions, Hobbs has suffered personal injuries, including severe emotional distress, physical injuries, and economic losses, and these injuries continue.

191.    Hobbs claims damages in an amount to be proven at trial, including attorneys' fees, injunctive relief, and other relief that the Court may deem proper.

## COUNT 5
### Deprivation of Liberty without Due Process of Law in Violation of 42 U.S.C. § 1983
### (AGAINST GOLUBSKI)

192.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

193.    Hobbs is authorized to bring this civil claim against Golubski pursuant to the civil remedies provision of 42 U.S.C. § 1983.

194.    Golubski, acting individually and within the scope of his employment with the Unified Government, deprived Hobbs of fundamental liberties without due process of law.

195.    Hobbs, pursuant to the Thirteenth Amendment, has a fundamental liberty interest in not being subjected to slavery and involuntary servitude.[124] This interest is implied to Golubski through the Fourteenth Amendment. Golubski deprived Hobbs of her liberty interest in not being subjected to slavery and involuntary servitude by forcing Hobbs to perform sexual acts on Golubski under the threat of arrest and criminal punishment.

196.    Simultaneously, Hobbs, pursuant to the Fourth Amendment, has a fundamental liberty interest in being secure in her person against unreasonable searches and seizures. Golubski deprived Hobbs of her liberty interest in being secure in her person against unreasonable searches and seizures by seizing her person for the express purpose of raping and/or sexually assaulting her and threating her in order to ensure Golubski remained free of any criminal charges.

197.    Simultaneously, Hobbs, pursuant to the First Amendment, has a fundamental liberty interest in her freedom of speech and access to the courts. Golubski deprived Hobbs of her liberty interest in freedom of speech and access to the courts by preventing Hobbs' access of these rights with threats of arrest and criminal punishment to ensure Golubski remained free of any criminal charges.

198.    Golubski performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Hobbs' clearly established constitutional rights. No reasonable officer between 2005-2010 would believe this conduct was lawful.

---

[124] *Jobson v. Henne*, 355 F.2d 129, 132 (2d Cir. 1966) ("As we cannot say that any such work program would not go beyond the bounds permitted by the Thirteenth Amendment, the complaint states a claim under § 1983"); *Smith v. Kentucky*, 36 F.4th 671, 675 (6th Cir. 2022), *cert. denied*, No. 22-91, 2022 WL 4654566 (U.S. Oct. 3, 2022); *Winbush v. Iowa By Glenwood State Hosp.*, 66 F.3d 1471, 1476 at FN 4 (8th Cir. 1995); *King v. Pridmore*, 961 F.3d 1135, 1142–43 (11th Cir. 2020), <u>cert. denied,</u> 209 L. Ed. 2d 546, 141 S. Ct. 2512 (2021).

199.     Golubski's acts, as described in the preceding paragraphs, were the direct and proximate cause of Hobbs' injuries. Golubski knew, or should have known, that his conduct would result in injuries and damages to Hobbs.

200.     Golubski's rape, sexual assault, and physical and emotional assault, and implicit threats to Hobbs and her family were motivated by an evil motive or intent, or involved reckless or callous indifference to Hobbs' federally protected rights.[125] Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[126] Given the nature of Golubski's conduct – including sexual assault – the wisdom of pecuniary punishment is justified and deterring future sexual assault by police officers is highly advisable.[127] Consequently, Hobbs is entitled to punitive damages.

## COUNT 6
### Failure to Intervene in Violation of 42 U.S.C. § 1983
### (AGAINST MILLER, BRESHEARS, ARMSTRONG, KILL, BYE, ZIEGLER, AND WARE)

201.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

202.     Hobbs is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

203.     By their conduct and under color of state law, these Defendants, acting within the scope of their employment, had opportunities to intervene on behalf of Hobbs to prevent her sexually assault, torture, unlawful seizure, and deprivation of liberty without due process of law, but with deliberate indifference, declined to do so.

---

[125] *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).
[126] *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (quoting *Smith*, 461 U.S. at 54).
[127] *Miller v. City of Mission, Kan.*, 705 F.2d 368, 377 (10th Cir. 1983) (quoting *Busche v. Burkee*, 649 F.2d 509, 520 [7th Cir. 1981]).

204.    These Defendants' failures to intervene violated Hobbs' clearly established constitutional right not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable Chief of Police or police officer between 2005-2010 would have believed that failing to intervene to prevent Golubski from sexually assaulting and unlawfully seizing Hobbs was lawful.

205.    These Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Hobbs' injuries. These Defendants knew, or should have known, that their conduct would result in Hobbs' continued rape and sexual assault.

206.    These Defendants' failure to intervene to prevent Golubski's acts, including Hobbs' sexual, physical, and emotional assault, were motivated by an evil motive or intent, or involved reckless or callous indifference to Hobbs' federally protected rights.[128] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[129] Given the nature of these Defendants' conduct – including sexual assault – the wisdom of pecuniary punishment is justified and deterring future sexual assault by police officers is highly advisable.[130] Consequently, Hobbs is entitled to punitive damages.

## COUNT 7
### Civil Rights Conspiracy in Violation of 42 U.S.C. § 1983
### (AGAINST MILLER, BRESHEARS, ARMSTRONG, KILL, BYE, GOLUBSKI, ZIEGLER, AND WARE)

207.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

208.    Hobbs is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

---

[128] *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).
[129] *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (quoting *Smith*, 461 U.S. at 54).
[130] *Miller v. City of Mission, Kan.*, 705 F.2d 368, 377 (10th Cir. 1983) (quoting *Busche v. Burkee*, 649 F.2d 509, 520 [7th Cir. 1981]).

209.     These Defendants, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Hobbs of her clearly established First, Fourth, Thirteenth, and Fourteenth Amendment rights to freedom of speech, access to the courts, freedom from unreasonable searches and seizures, freedom from slavery and involuntary servitude, and freedom from deprivation of liberty without due process of law.

210.     In furtherance of the conspiracy, these Defendants engaged in and facilitated numerous overt acts, as described in greater detail above. As a direct and proximate result of these Defendants' actions, Hobbs was repeatedly raped, sexually assaulted, and suffered the other grievous damages and injuries as set forth above.

211.     These Defendants' acts, as described in greater detail above, were motivated by an evil motive or intent, or involved reckless or callous indifference to Hobbs' federally protected rights.[131] These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[132] Given the nature of these Defendants' conduct – including rape and sexual assault – the wisdom of pecuniary punishment is justified and deterring future sexual assault by police officers is highly advisable.[133] Consequently, Hobbs is entitled to punitive damages.

## COUNT 8
### Supervisory Liability in Violation of 42 U.S.C. § 1983
### (AGAINST DAILEY, SWAFFORD, MILLER, AND BRESHEARS)

212.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

---

[131] *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).
[132] *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (quoting *Smith*, 461 U.S. at 54).
[133] *Miller v. City of Mission, Kan.*, 705 F.2d 368, 377 (10th Cir. 1983) (quoting *Busche v. Burkee*, 649 F.2d 509, 520 [7th Cir. 1981]).

213.     Hobbs is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

214.     Golubski acted with impunity in an environment in which Dailey, Swafford, Miller, and Breshears, Golubski's supervisors, (i) exercised control or direction; (ii) failed to supervise; (iii) knew of the violation and acquiesced in its continuance; and (iv) promulgated, created, implemented, or utilized a policy that caused the deprivation of Hobbs' constitutional rights, all as explained in greater detail above.[134]

215.     These Defendants' actions were with recklessness and/or deliberate indifference to Hobbs' constitutional rights, as explained is greater detail above. Had these Defendants exercised proper control, direction, or supervision; prevented Golubski's continued conduct once aware of his violations; and not promulgated, created, implemented, or utilized a policy that caused deprivation of Hobbs' constitutional rights, Golubski would not have sexually assaulted and physically and emotionally harmed Hobbs. These Defendants specifically supervised the specific acts taken by Golubski, and these Defendants knew of Golubski's conduct toward and treatment of Hobbs (and other Black women) and either facilitated, approved, condoned, or turned a blind eye toward it.

216.     These Defendants' reckless and/or deliberately indifferent conduct, all under color of state law, violated their duty, which had been clearly established by 2005, to supervise Golubski, and no reasonable Police Chief in 2005 would have believed that his conduct and actions in the face of actual or constructive notice of misconduct by his subordinate police officers was lawful.

---

[134] *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

217.     As a direct and proximate result of these Defendants' actions (and failure to act), Hobbs was sexually assaulted, emotionally harmed, and suffered the other grievous damages and injuries set forth above.

218.     These Defendants' supervision of Golubski's conduct toward and treatment of Hobbs (as set forth above) was motivated by an evil motive or intent, or involved reckless or callous indifference to Hobbs' federally protected rights.[135] These Defendants' supervision of Golubski's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[136] Given the nature of these Defendants' supervision of Golubski's conduct – including sexually assault and rape – the wisdom of pecuniary punishment is justified and deterring future chief of police supervision of police officers sexually assaulting and raping is highly advisable.[137] Consequently, Hobbs is entitled to punitive damages.

## COUNT 9
### Monell Claim for Unconstitutional Customs, Polices, and Practices
### in Violation of 42 U.S.C. § 1983
### (AGAINST THE UNIFIED GOVERNMENT)

219.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

220.     Hobbs is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

221.     The Unified Government was, at all times relevant to this Complaint, responsible for the polices, practices, and customs of KCKPD.

---

[135] *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983).
[136] *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (quoting *Smith*, 461 U.S. at 54).
[137] *Miller v. City of Mission, Kan.*, 705 F.2d 368, 377 (10th Cir. 1983) (quoting *Busche v. Burkee*, 649 F.2d 509, 520 [7th Cir. 1981]).

222.   The Unified Government is the successor entity to the City of Kansas City, Kansas, which employed all of the other Defendants at all times relevant to this Complaint.

223.   The Unified Government, by and through its final policymakers, had in force and effect in 2005-2006 a policy, practice, or custom of unconstitutional misconduct, including, in particular, informal policies, procedures, and customs that created a widespread practice of police abusing their government authority (including kidnapping, coercing, pressuring, sexually assaulting, and raping Black women; improper investigative practices to obtain wrongful convictions and support the government-sanctioned Protection Racket, and discouraging, preventing, and failing to investigate complaints of misconduct).

224.   The Unified Government, by and through its final policymakers, had in force and effect in 2005-2006 a policy, practice, or custom of failing to adequately supervise, discipline, and train its police officer detectives.

225.   The Unified Government, by and through its final policymakers, had in force and effect in 2005-2006 a policy, practice, or custom of encouraging further abuse, including ratification of unconstitutional conduct and fostering a culture of abuse.

226.   The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that KCKPD detectives used the misconduct described in greater detail above.

227.   The Unified Government, by and through its final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that widespread failures to supervise or discipline officers for misconduct enabled such employees to engage in misconduct without repercussion.

228.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Hobbs.

229.    Despite repeated opportunities to do so and for years beforehand, the Unified Government, by and through its final policymakers, failed to adequately supervise, discipline, and train its employee detectives to use proper and legal investigative tactics by not physically, psychologically, and sexually abusing female informants, coercing those informants to provide false evidences, illegally protecting individuals involved in the illegal drug trade, failing to turn over exculpatory evidence to the prosecution and criminal defendants, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

230.    The egregious acts of Detective Defendants and other employees were deliberately ignored by the Unified Government, despite multiple employees, and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

231.    The Unified Government, by and through its final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, Hobbs' rape and sexual assault.

232.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Hobbs' rape and sexual assault, as well as all of the other grievous injuries and damages set forth above.

## COUNT 10
*Violation of the Equal Protection Clause of the Fourteenth Amendment*
*in Violation of 42 U.S.C. § 1983*
(AGAINST ALL DEFENDANTS)

233.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

234. Hobbs is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

235. The Equal Protection Clause of the Fourteenth Amendment prohibits Defendants from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

236. Defendants policed the Black community, including Plaintiff, different from their similarly situated white counterparts.

237. Defendants specifically targeted Black women, including Plaintiff, to rape, sexually assault, traffic and otherwise abuse.

238. Defendants singled out the Black community and Black women, including Plaintiff, to further their criminal activity, including the sale of crack cocaine and other drugs, gambling, trafficking in stolen goods, sex trafficking and prostitution.

239. Defendants' policing practices targeted the Black community, including Plaintiff and other "Golubski Girls", to secure false convictions.

240. Defendants' policing practices denied the Black community, including Plaintiff, protection and safety otherwise provided to their similarly situated white counterparts.

241. Plaintiff has no adequate remedy at law other than the judicial relief sought in this case. A failure to enjoin Defendants will immediately irreparably harm Plaintiff and the Black residents of Kansas City, Kansas who are subjected to disparate policing because of their race.

<u>COUNT 11</u>
*Violation of Title VI*
*in Violation of 42 U.S.C. § 1983*
(AGAINST ALL DEFENDANTS)

242. The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

243.    Hobbs is authorized to bring this civil claim against the Unified Government pursuant to the civil remedies provision of 42 U.S.C. § 1983.

244.    Title VI of the Civil Rights Act states that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity[.]"

245.    Defendants have accepted financial assistance, and continue to accept financial assistance, from the federal government subjecting them to the requirements under Title VI.

246.    Defendants have engaged in law enforcement practices with the intent to discriminate against Black individuals on the basis of race, color, or national origin.

247.    Defendants law enforcement practices, as alleged herein, constitutes intentional discrimination based on race and/or color in violation of Title VI.

248.    Plaintiff has been, and continues to be, denied the benefits of her community because of the actions of Defendants, as set forth herein, based on her race and/or color.

249.    Plaintiff has been, and continues to be, denied the benefits of the protection and service of the police department because of her race and/or color.

250.    Plaintiff has been subjected to intentional discrimination by Defendants as she was groomed, abused, exploited, assaulted, raped, and otherwise harassed based on her race and/or color; Plaintiff's white counterparts were/are not subject to such actions by Defendants.

251.    Plaintiff has no adequate remedy at law other than the judicial relief sought in this case. A failure to enjoin Defendants will immediately irreparably harm Plaintiff and the Black residents of Kansas City, Kansas who are subjected to disparate policing because of their race.

## COUNT 12
### *Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO")*
### *18 U.S.C. §§ 1962 and 1964*
### (AGAINST ALL DEFENDANTS)

69

252.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

253.     Defendants, by their unlawful actions, ratification of unlawful actions, and failure to intervene and/or rectify the unlawful actions, have violated 18 U.S.C. §§ 1962 and 1964.

254.     Defendants' conduct violated and continues to violate 18 U.S.C. §§ 1511, 1512, 1951, 1957, as well as their acts involving murder, kidnapping, robbery, bribery, sexual assault and rape, trafficking, and extortion.

255.     Defendants' engagement and involvement with the organization known as KCKPD constitutes an "enterprise" as defined by § 18 U.S.C. 1961.

256.     Defendants committed and continue to commit such acts against Plaintiff, by obstructing law enforcement in purporting to act under the color of state law as peace officers, when they in fact are not acting as peace officers, but as racketeers by engaging in illegal conduct; financial transactions in property derived from unlawful activity, i.e., the Protection Racket; and by threatening kidnapping, murder, robbery, bribery, sexual assault and rape, trafficking, and/or extortion.

257.     Plaintiff has been, and continues to be, subjected to the following illegal conduct[138]:

    a.   Extortion;

    b.   Sexual assault;

    c.   Rape;

    d.   Trafficking;

    e.   Fraud;

    f.   Forced labor or slavery;

---

[138] *See also, USA v. Golubski*, Case No. 22-40055-TC; *USA v. Brooks, et al.*, Case No. 40086-01/04-TC; and *Houcks, et al. v. Unified Government of Wyandotte County and Kansas City, Kansas, et al.*, Case No. 2:23-cv-02489-TC.

g.   Assault with a dangerous weapon;

h.   Bribery;

i.   Kidnapping;

j.   Obstruction of justice;

k.   Arson;

l.   Witness tampering;

m.  Conspiracy;

n.   Deprivation of civil rights;

258.   Additionally, Defendants have a pattern of engaging in the following illegal conduct[139]:

a.   Murder;

b.   Gambling;

c.   Robbery;

d.   Prostitution;

e.   Money laundering;

f.   Dealing in a controlled substance;

259.   The acts stated herein, committed by Defendants, constitute a pattern of racketeering activity as defined by § 18 U.S.C. 1961.

260.   Defendants have engaged in and committed such acts within the previous ten years and continue to engage in witness tampering against Plaintiff as Defendants are aware she is a potential witness to testify in Golubski's criminal trials.

261.   As a direct and proximate result of Defendants' acts and involvement in the enterprise, Plaintiff was and continues to be injured.

---

[139] *See id.*

71

**DEMAND FOR JURY TRIAL**

262.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands trial to a jury on all issues so triable in this action.

**DESIGNATION OF PLACE OF TRIAL**

263.     Pursuant to D. Kan. Rule 40.2, Plaintiff request Kansas City, Kansas as the place of trial.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants as follows:

A.     Declare that Defendants actions constitutes intentional discrimination in violation of the Fourteenth Amendment and Title VI.

B.     Enjoin Defendants, its officers, agents and employees from engaging in any of the predicate discriminatory acts forming the basis of Plaintiffs' claims in this lawsuit;

C.     Award compensatory damages to Plaintiff and against all Defendants, jointly and severally, as will fully and adequately compensate Plaintiff for the damages she has suffered, in an amount to be determined at trial;

D.     Award punitive damages to Plaintiff, jointly and severally, in an amount to be determined at trial, for Defendants' violations of federal law that will deter such conduct by Defendants in the future;

E.     For pre-judgment and post-judgment interest and Plaintiff's attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against State officials;

F.      Award Plaintiff appropriate relief as set forth in 18 U.S.C. § 1964, including but not limited to costs and attorneys' fees;

G.      Retain jurisdiction to render any and all further orders that this Court may enter;

H.      Award Plaintiff injunctive relief that requires the Unified Government to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the intentional discrimination and harassment, sexual abuse, exploitation, and trafficking of the Citizens of Wyandotte County; and

I.      For any and all other relief for which the Court deems just and proper.


Respectfully submitted,


**WEBSTER LAW, LLC**

_/s/ Madison J. McBratney_
Madison J. McBratney KS Bar # 29904
1317 W. 13th Terrace,
Level #4/A
Kansas City, MO, 64102
Office Ph. (816) 629-6055
Direct Ph. (816) 629-6042
Fax. (816) 934-1194
E-mail: mmcbratney@sjwebsterlaw.com

**ATTORNEYS FOR PLAINTIFF**

73